**William L. CARRUTH**

v.

**The UNITED STATES.**

**Frank BARBEE et al.**

v.

**The UNITED STATES.**

Nos. 20–78, 485–78.

United States Court of Claims.

July 2, 1980.

**1070**

Harold E. Vanberg, Jr., Dallas, Tex., attorney of record for plaintiffs. Jeffrey M. Glosser, Washington, D.C., and Goins & Underkofler, Dallas, Tex., of counsel.

Frank M. Rapoport, Washington, D.C., with whom was Asst. Atty. Gen. Alice Daniel, Washington, D.C., for defendant. James R. Walczak, Washington, D.C., of counsel.

Before FRIEDMAN, Chief Judge, COWEN, Senior Judge, and NICHOLS, Judge.

### OPINION

COWEN, Senior Judge:

The Texas peanut farmers who are the plaintiffs in these two consolidated cases broadly challenge the authority of the Secretary of Agriculture (the Secretary) to reduce or withhold price supports from peanuts containing the mold *Aspergillus flavus* (*A. flavus*). As alternative grounds for recovery, plaintiffs allege that by withholding the price supports for such peanuts, the Government breached an implied contract with plaintiffs. They also assert that a United States Department of Agriculture (USDA) marketing regulation (known as the "24-hour rule") operated to deny them due process of law, as well as equal protection of the laws, and constituted a taking of their property without just compensation—all in violation of the Fifth Amendment of the Constitution. Additionally, plaintiffs attack as arbitrary and capricious procedures used by USDA to identify the presence of the mold on the peanuts. The cases are before us on cross-motions for summary judgment. We reject plaintiffs' challenge to the authority of the Secretary to reduce or withhold price supports from peanuts containing the *A. flavus* mold; hold that, with one exception, plaintiffs are not entitled to recover on any of the alternative grounds alleged, and grant defendant's motion for summary judgment on these aspects of the cases. The exception is plaintiffs' claim based on the procedures used to identify the *A. flavus* mold, with respect to which we find there exist disputed, material issues of fact which make summary judgment inappropriate and require a remand to the Trial Division.

### I.

As is the case with many agricultural commodities, the production and marketing of peanuts is pervasively regulated by Congress and USDA.[1] This regulatory scheme is intended to benefit different groups with sometimes conflicting interests: producers, handlers, processors, and consumers. 7 U.S.C. § 1357 (1976). The principal benefits intended to be achieved by the regulatory scheme are the establishment and the maintenance of parity prices,[2] the establishment and maintenance of orderly marketing conditions, and the avoidance of unreasonable fluctuations in supply and price. 7 U.S.C. §§ 601–602, 1357 (1976).

---

1. *See generally*, W. Rasmussen, G. Baker, and J. Ward, A Short History of Agricultural Adjustment 1933–75 (Agriculture Information Bulletin No. 391, 1976).

2. Parity refers to "that gross income from agriculture which will provide the farm operator and his family with a standard of living equivalent to those afforded persons dependent upon other gainful occupation." 7 U.S.C. § 1301(a)(2) (1976).

The regulatory scheme established by Congress for peanuts contains the basic elements of most agricultural support programs: restrictions on production and marketing, and supported prices.[3] *See* 7 U.S.C. §§ 1357–1359, 1421–1441 (1976). Between July 1 and December 1 of each year the Secretary establishes a national marketing quota for peanuts. 7 U.S.C. § 1358(a) (1976). When this quota is expressed in terms of acres it is known as the national acreage allotment. *Id.* The national acreage allotment is apportioned among the peanut producing states and each state's allotment is in turn apportioned among the peanut farmers within the state. 7 U.S.C. § 1358(c)–(d) (1976). A farmer who does not plant peanuts on an acreage in excess of his allotment is known as a "cooperator", 7 U.S.C. § 1428(b) (1976), and is eligible for price supports on his peanut crop. 7 U.S.C. § 1421(c) (1976). Peanuts marketed by a farmer without an acreage allotment or in excess of his allotment are not only ineligible for price supports, but are also subject to marketing penalties. 7 U.S.C. §§ 1359, 1421(c) (1976).

The Secretary provides price supports for peanuts through the Commodity Credit Corporation (CCC).[4] 7 U.S.C. § 1421(a) (1976). The CCC makes warehouse storage loans to cooperative peanut marketing associations which contract with it. 7 C.F.R. § 1446.10 (1979). (Plaintiffs here dealt with the Southwest Peanut Growers Association (SWPGA)). The cooperative marketing association stores and handles the peanuts of cooperating farmers and makes nonrecourse loans to the farmers, using the peanuts as collateral.[5] 7 U.S.C. § 1425 (1976), 7 C.F.R. § 1446.10 (1979). The amount of the loan made to a producer is determined by the price support level for peanuts in a particular year. 7 C.F.R. § 1446.10 (1979). The price support level is a percentage of the parity price for peanuts. 7 U.S.C. § 1441 (1976). The parity price is computed annually pursuant to a statutory formula, 7 U.S.C. § 1301(a) (1976), and the percentage of parity paid as the support price is based upon the available supply of peanuts. 7 U.S.C. §§ 1428(e), 1441(b) (1976). From 1973 to 1977 the minimum price support level for peanuts was statutorily mandated at 75 percent of parity. 7 U.S.C. § 1441(b) (1976 & Supp. I 1977).

*A. flavus* mold is a principal source of aflatoxin in agricultural commodities such as peanuts, barley, oats, wheat, and corn. Aflatoxin is a powerful carcinogen. The potential danger of aflatoxin as a carcinogen in peanuts first became known to the officials of USDA in the mid-1960's. No decision was then made to reduce or eliminate price supports for peanuts contaminated with the mold, because this was a new and critical problem which faced the growers and other segments of the industry. Also, at that time, USDA officials felt that there was no rapid and reliable method of indicating the presence of mold in farmers' stock peanuts. However, USDA took strict measures to prevent products made from contaminated peanuts from reaching the edible market. It was determined that these measures were necessary both to protect the health of the nation and the farmers by preserving consumer confidence in the peanut industry.

On February 14, 1973, USDA published in the Federal Register a notice of proposed

---

**3.** As will be seen, *infra*, plaintiffs' suit pertains only to the support program for the 1973–77 crops of peanuts. All references herein to the provisions of the support program are, except where otherwise indicated, to the program as it existed for those crop years. Congress made major changes in the peanut support program effective with the 1978 peanut crop. *See* The Food and Agriculture Act of 1977, Pub.L. 95–113, 91 Stat. 913 (1977).

**4.** The CCC was established by the Commodity Credit Corporation Charter Act, 62 Stat. 1070

(1948), codified as 15 U.S.C. §§ 714–714p (1976), as an agency within USDA. The CCC is charged with "stabilizing, supporting, and protecting farm income and prices," 15 U.S.C. § 714 (1976), and is empowered to do so through a variety of means, including loans, payments, and purchases, 15 U.S.C. § 714c (1976).

**5.** Nonrecourse loans as used here means that a farmer may forfeit his peanuts to the marketing association in lieu of repaying the loan.

rule making for the 1973 peanut crop. 38 Fed.Reg. 4408 (1973). The notice stated, *inter alia*, that USDA was considering "making peanuts with visible *A. flavus* mold of the type that produces aflatoxin ineligible for price supports." *Id.* at 4409. Peanuts containing the visible mold are classified as segregation 3 (seg. 3) peanuts. 7 C.F.R. § 1446.3(p) (1974). The final regulations for the 1973 peanut crop, published on July 11, 1973, did not make the seg. 3 peanuts ineligible for price supports, but they did reduce the price support level for such peanuts by $50 a ton. 38 Fed.Reg. 18453 (1973). The $50 discount was considered by USDA as an interim measure for the 1973 crop; it was felt that an order making such peanuts ineligible for the support program should be delayed another year in order to give producers and the industry some time to make adjustments.

For the 1974 crop of peanuts, USDA completely withdrew price supports for peanuts classified as seg. 3 by regulation published on July 15, 1974. 39 Fed.Reg. 25949 (1974), 7 C.F.R. § 1446.7 (1975). Seg. 3 peanuts remained ineligible for price supports through 1977. 7 C.F.R. § 1446.7(a)(7) (1978).

As a farmer harvests peanuts, he brings them by truckload to a buying point, where they are tested and graded by a representative of the Federal-State Inspection Service. This representative conducts a microscopic examination of a sample of each load in order to determine whether the *A. flavus* mold is present on any of the peanuts. As previously stated, peanuts which are found to contain the mold are classified as seg. 3 peanuts. Seg. 1 peanuts are farmer stock peanuts which are free of the mold and contain no more than 2 percent damaged kernels, nor more than 1 percent concealed damage caused by rancidity, mold and decay. 7 C.F.R. § 1446.3(p) (1974). Seg. 2 peanuts are those which are free from visible mold, but they may possess more than 2 percent damaged kernels or more than 1 percent concealed damage. *Id.*

At the buying point, the farmer either sells his peanuts to a sheller/handler, or pledges them to the local cooperative marketing association and receives his nonrecourse CCC loan.

Peanuts have three principal uses other than for seed. Cleaned in shell peanuts are, as the name suggests, still in the shell when sold to the public and are commonly referred to as "ball park" peanuts. Shelled peanuts are those which have been removed from their shells and are used principally for peanut butter, candy and cocktail nuts. Crushed peanuts are used for cooking oil and salad oil. Seg. 3 peanuts are not suitable for either of the first two uses mentioned, because of the dangers presented by aflatoxin. Seg. 3 peanuts may, however, be crushed for salad and cooking oil which is safe for human consumption.

As a practical matter, prior to 1973, when seg. 1, seg. 2 and seg. 3 peanuts were eligible for full price supports, the market price for all three classes of peanuts was the same as the price support level. Beginning with the $50 reduction in the price support level for seg. 3 peanuts in 1973, the market price for peanuts to be crushed for oil dropped considerably below the price support level.[6] Since shellers/handlers were prohibited by the terms of the Peanut Marketing Agreement[7] from acquiring seg. 3 peanuts except for the purpose of crushing for oil, farmers whose peanuts were classified as seg. 3 received a price below the

6.

| Year | Market Price for Oil Peanuts | Price Support |
|------|------------------------------|---------------|
| 1974 | $360 per ton | $366 per ton |
| 1975 | $260 per ton | $394.50 per ton |
| 1976 | $230 per ton | $414 per ton |
| 1977 | $200 per ton | $430 per ton |

7. The Peanut Marketing Agreement was a 1965 agreement entered into by certain segments of the peanut industry and USDA pursuant to the Agricultural Marketing Agreement Act of 1937, 50 Stat. 246, 7 U.S.C. § 601, *et seq.* (1976). The principal purpose of the agreement was to control the marketing of seg. 3 peanuts so that peanuts containing *A. flavus* would not reach the public except after having been safely crushed for oil.

price support level during the years 1973–77 even if they sold the peanuts rather than pledging them to the CCC for a price support loan.

## II.

Plaintiffs make a five-pronged attack on the Secretary's actions pertaining to seg. 3 peanuts in the years 1973–77. They charge that:

(1) The reduction of the price support level for seg. 3 peanuts in 1973 and the denial of price supports for seg. 3 peanuts from 1974–77, violated 7 U.S.C. §§ 1357, 1421(a), 1423, and 1441 and was illegal.

(2) The reduction of the price support level for seg. 3 peanuts in 1973 and the denial of price supports for seg. 3 peanuts from 1974–77 breached an implied contract between plaintiffs and defendant.

(3) The operation of the 24-hour rule forced peanut farmers to relinquish title to their peanuts and violated the Fifth Amendment in that it was both an uncompensated taking and a denial of due process.

(4) The 24-hour rule discriminated against peanut farmers in that a similar rule was not imposed on shellers/handlers and the rule thereby denied the farmers equal protection of the laws.

(5) The reduction of the price support level for seg. 3 peanuts in 1973 and the denial of price supports for seg. 3 peanuts from 1974–77 on the basis of the microscopic testing procedure used by the inspectors to identify *A. flavus* was arbitrary and capricious.

■ Defendant denies each of these five contentions and in addition argues that plaintiffs' claims are barred by laches. We will discuss defendant's laches defense first. An essential element of laches is proof of prejudice to a defendant caused by a plaintiff's delay. *Gutierrez v. Waterman Steamship Corp.*, 373 U.S. 206, 215–16, 83 S.Ct. 1185, 1191–92, 10 L.Ed.2d 297 (1963); *Carrasco v. United States*, 215 Ct.Cl. 19, 29

(1977); *Ahern v. United States*, 142 Ct.Cl. 309, 313–14 (1958). Yet defendant has failed to show that it has suffered any prejudice by reason of plaintiffs' delay in bringing this suit. The prejudice that defendant alleges it has suffered is that the CCC did not receive the peanuts it would have been entitled to had plaintiffs first turned their peanuts over to SWPGA and then chosen not to repay their price support loans.[8] We do not think that defendant was prejudiced by the failure of plaintiffs to turn their peanuts over to the CCC. Plaintiffs are not asking this court to award them the full statutory price support level for their peanuts. They sue for the difference between the price support level and the price they actually received for their peanuts on the market when they were sold for crushing. Since, as defendant repeatedly acknowledges throughout its briefs, the CCC in all likelihood would also have been forced to sell the pledged and forfeited seg. 3 peanuts for oil, the sums plaintiffs seek are the identical sums CCC would have paid out of its own funds as price supports if the farmers had turned their peanuts over to it.

Furthermore, this court has traditionally confined the defense of laches to suits by Government personnel to recover back pay, retirement benefits, etc. *See Kaiser Aluminum & Chemical Corp. v. United States*, 388 F.2d 317, 319–20, 181 Ct.Cl. 902, 906–07 (1967). We see no reason to depart from that tradition on the basis of the facts presented to us here. We therefore conclude that plaintiffs' claims are not barred by laches and turn to a *seriatim* examination of the five contentions constituting plaintiffs' challenge to the Secretary's actions involving seg. 3 peanuts in the period 1973–77.

## III.

■ Plaintiffs' principal contention in these suits, and the one to which the parties have devoted the most argument, is that the Secretary lacked the statutory authori-

---

**8.** Since defendant paid no price supports for seg. 3 peanuts from 1974 to 1977, plaintiffs apparently did not pledge any seg. 3 peanuts to CCC through SWPGA, but instead sold their seg. 3 peanuts to shellers/handlers to be crushed for oil.

ty both to reduce price supports for seg. 3 peanuts in 1973 and to deny price supports for seg. 3 peanuts from 1974 to 1977. The bottom line of plaintiffs' position is that the pertinent statutory provisions compel the Secretary to pay the same price supports for seg. 3 peanuts as were paid for seg. 1 or seg. 2 peanuts. Because the defendant relies principally on 7 U.S.C. § 1423 (1976) as authority for the 1973 price support reduction, but on 7 U.S.C. § 1421 (1976) as authority for the 1974-77 price support denial, we will examine the reduction and the denial separately.

A. As discussed earlier, on February 14, 1973, USDA published in the Federal Register a notice of proposed rule making pertaining to the 1973 peanut crop. 38 Fed. Reg. 4408 (1973). This notice included a statement that USDA was considering making peanuts containing *A. flavus* ineligible for price supports. The authority cited in the notice for the 1973 program included section 403 of the Agricultural Act of 1949, 63 Stat. 1054. Section 403 is codified as 7 U.S.C. § 1423 (1976) and provides in pertinent part as follows:

> **§ 1423. Adjustment of support prices**
>
> Appropriate adjustments may be made in the support price for any commodity for differences in grade, type, staple, quality, location, and other factors. Such adjustments shall, so far as practicable, be made in such manner that the average support price for such commodity will, on the basis of the anticipated incidence of such factors, be equal to the level of support determined as provided in this Act. * * *

Defendant contends that the $50 per ton reduction for seg. 3 peanuts in the 1973 crop was authorized by this provision as a "quality" adjustment. Defendant has supplied copies of USDA documents showing that the overall level of support for peanuts was maintained at 75 percent of parity. This was done by adding to the non-seg. 3 peanut production of 1,661,000 tons an amount of $1.51 per ton as compensation for the $50 per ton reduction for seg. 3 peanuts.[9]

Plaintiffs present two different arguments as to why the Secretary's action in imposing the $50 per ton reduction was not authorized by section 1423:

(1) Section 1423 does not apply to seg. 3 peanuts.

(2) The Secretary's action was not implemented pursuant to section 1423.

Plaintiffs' arguments are without merit. Section 1423 by its own terms allows adjustments to be made for "quality", but plaintiffs nevertheless assert that the only purpose of that section is to control the supply of the various types of peanuts. We reject this argument because it is contrary to the plain language of section 1423. Moreover, the 1973 price support regulation, as well as previous price support orders, provided that in calculating support values there would be a discount per ton for damaged kernels (7 C.F.R. § 1446.11(c) (1974)); a discount for sound, split kernels (7 C.F.R. § 1446.11(d) (1974)); a discount for foreign material (7 C.F.R. § 1446.11(e) (1974)), and a discount of $50 per ton for peanuts containing visible *A. flavus* mold (7 C.F.R. § 1446.-11(f) (1974)). Plaintiffs concede that the Secretary had the authority to make the discounts referred to in 7 C.F.R. §§ 1446.-11(c), (d) and (e), and we find no logical reason why the Secretary was not also authorized to make a "quality" discount for

---

9. Plaintiffs correctly point out that the addback of $1.51 a ton was technically paid as a reduction of the handling, storage and inspection fee (HSI fee) imposed on producers. The HSI fee was reduced from $15 a ton to $13.49 a ton. Plaintiffs argue that the $15 deduction had reduced the overall level of price supports below the statutorily mandated level of 75 percent of parity and that reducing the deduction from $15 per ton to $13.49 per ton did not restore the price support level to 75 percent of parity. The argument that HSI fees reduce price supports has been thoroughly examined by the United States District Court for the Northern District of Texas in an unpublished opinion. That court held that "the deduction for HSI charges in 1973-77 did not reduce the price support which the CCC was required to pay." *Texas Peanut Producers Board v. United States*, Civil No. 3-18-1171-H, slip op. at 5 (N.D. Texas, filed May 8, 1980). We agree with this holding and as a consequence need say no more about this aspect of plaintiffs' argument.

the peanuts containing the visible mold. There is no doubt that the mold affected the "quality" of the peanuts.

With regard to plaintiffs' argument that the 1973 reduction of peanut price supports was not implemented pursuant to section 1423, the notice of rule making for the 1973 peanut crop stated explicitly that section 1423 was one of the sources of the Secretary's authority to modify price supports.[10] 38 Fed.Reg. 4408 (1973). In short, plaintiffs' challenge to the Secretary's authority under 7 U.S.C § 1423 (1976) to reduce price supports on seg. 3 peanuts in 1973 is without substance and must be rejected.

In any event, we think that the Secretary was authorized by section 401 of the Agricultural Act of 1949, codified as 7 U.S.C. § 1421 (1976), to provide for the 1973 reduction in the support price of peanuts. Section 1421 provides in pertinent part:

§ 1421.  **Price support**

  \*     \*     \*     \*     \*     \*

(b) Except as otherwise provided in this Act, the amounts, terms, and conditions of price support operations and the extent to which such operations are carried out, shall be determined or approved by the Secretary. \* \* \*

Our reasons for this conclusion are set forth in the following subsection B. Both ·the notice of rule making for the 1973 crop, 38 Fed.Reg. 4408 (1973), and the final regulation, 7 C.F.R. part 1446 (1974), expressly refer to section 1421 as authority for the action taken.

B.  In support of the Secretary's authority to completely deny price supports to peanuts containing A. flavus during the years 1974–77, the defendant relies principally on 7 U.S.C. § 1421 (1976).[11] Defendant contends that making seg. 3 peanuts ineligible for price supports was a reasonable term and condition of the price support program

within the meaning of section 1421. Such a condition served two objectives according to defendant:

(1) It encouraged farmers to produce peanuts which were free of A. flavus.

(2) It prevented the price support program from becoming a "dumping ground" for peanuts not fit for their primary, edible uses.

Defendant emphasizes that USDA has for many years interpreted 7 U.S.C. § 1421 (1976) as granting the Secretary the power to withhold price supports from commodities which fail to meet minimum quality standards established by USDA. Under authority of section 1421, USDA has since 1956 conditioned eligibility for price supports for a variety of commodities on the commodity being free of substances "poisonous to man or animals." E. g. rice, corn, wheat, and barley, 21 Fed.Reg. 713 (1956). Again citing section 1421 as authority, USDA has since the early 1970's limited the eligibility of a number of commodities for price supports to samples which are free of "toxin producing molds." E. g. barley, 7 C.F.R. § 1421.51(a) (1974); rice, 7 C.F.R. § 1421.302(a) (1974); rye, 7 C.F.R. § 1421.-337(a) (1974).

Also, defendant has submitted an affidavit of the Administrator, Agricultural Stabilization and Conservation Service, USDA. In his affidavit the Administrator states that:

It has been the long-standing administrative practice of the Department of Agriculture to require, as a term and condition of price support, that commodities tendered to the Government under price support programs meet certain minimum standards of quality. These minimum standards are promulgated in the appropriate program regulations as eligibility requirements for a given commodity.

---

**10.** Defendant has also supplied an affidavit from the Director of the Price Support and Loan Division, Agricultural Stabilization and Conservation Service, USDA, stating that in reducing price supports for the 1973 peanut crop USDA relied on both sections 1421 and 1423. Plaintiffs have not contradicted this affidavit except by unsupported statements in their briefs.

**11.** This section was listed in the notice of rule making for the 1974 peanut support program as one of the sources of the Secretary's authority. 38 Fed.Reg. 27939 (1973).

They have been consistently applied to practically all commodities for which price support is made available, including commodities for which price support is mandatory, as well as commodities for which price support is discretionary.

It has been the consistent view of the Department of Agriculture that this practice is well within the authority of the Secretary of Agriculture, under section 401(b) of the Agricultural Act of 1949 [7 U.S.C. § 1421(b) (1976)], to establish reasonable terms and conditions of price support. Likewise, it has been the consistent view of the Department of Agriculture that this practice is not prohibited or restricted by the legislative mandate of the Agricultural Act of 1949 to provide minimum levels of price support for certain specified commodities, including peanuts.

As another example of USDA's traditional interpretation of section 1421, defendant points out that when the Chairman of the Committee on Agriculture of the House of Representatives requested USDA to state the legal basis for its decision to withhold price supports from peanuts containing *A. flavus*, the General Counsel of USDA cited section 1421 as the source of the Secretary's authority.

With respect to the scope of judicial review, defendant has directed our attention to the Administrative Procedure Act, 5 U.S.C. § 701(a) (1976) which exempts from judicial review cases in which (1) statutes preclude review or (2) agency action is committed to agency discretion by law. Defendant argues that the decision to deny seg. 3 peanuts price supports is the kind of policy decision which is committed to agency discretion by the provisions of 7 U.S.C. § 1421(b) (1976), quoted above. Defendant also asserts that the Secretary's action is shielded from judicial review by section 412 of the Agricultural Act of 1949, codified as 7 U.S.C. § 1429 (1976), which provides:

**§ 1429. Determinations of Secretary as final and conclusive**

Determinations made by the Secretary under this Act shall be final and conclusive: *Provided,* That the scope and nature of such determinations shall not be inconsistent with the provisions of the Commodity Credit Corporation Charter Act.

Defendant concedes, however, that this provision does not preclude judicial review of the Secretary's action if he has exceeded his statutory authority.[12] Throughout their briefs and at oral agreement, plaintiffs have also recognized that their primary burden in these cases is to establish that the action taken by the Secretary in the challenged regulations violated his statutory authority.

We agree that our examination of the Secretary's action is very limited. We do not sit to consider the wisdom of the Secretary's decisions, but only to determine that he has acted rationally and within his statutory authority. *Hiatt Grain & Feed, Inc. v. Bergland,* 446 F.Supp. 457, 469–77 (D.Kan. 1978), *aff'd* 602 F.2d 929 (10th Cir. 1979), *cert. denied* 444 U.S. 1073, 100 S.Ct. 1019, 62 L.Ed.2d 755 (1980); *Texas Peanut Producers Board v. United States,* Civ. No. 3–78–1171–H, slip op. at 6 (N.D.Texas, filed May 8, 1980); *Nabisco, Inc. v. United States,* 220 Ct.Cl. ——, ——, 599 F.2d 415, 419 (1979).

As the district court stated in *Hiatt Grain & Feed, Inc., supra,* 446 F.Supp. at 472:

The statutes granting authority to the Secretary of Agriculture and the C.C.C. in this realm [of price supports] are not unambiguous. They must be, and have been, broadly interpreted. The history of farm support programs over the past 45 years substantiates the breadth of authority which defendant [Secretary] claims in this action. * * *

   *    *    *    *    *    *

The fact that the USDA has for many years limited price supports of a number of basic agricultural commodities to those which are free of poisonous or toxic substances is highly persuasive of the Secre-

---

12. Defendant's Reply Brief at p. 19.

tary's discretionary authority under section 1421.

Plaintiffs have advanced a number of arguments in support of their contention that the Secretary lacked statutory authority to deny price supports to their seg. 3 peanuts. Plaintiffs first point to the definition of peanuts set out in section 359 of the Agricultural Adjustment Act of 1938, codified as 7 U.S.C. § 1359(c) (1976). That provision states that the term "peanuts" means "all peanuts produced."[13] Carrying this definition of peanuts over into 7 U.S.C. § 1441 (1976) which sets out the minimum level of price supports for "peanuts", plaintiffs reason that seg. 3 peanuts are entitled to the same minimum level of support as seg. 1 and seg. 2 peanuts, because "all peanuts produced" are entitled to price supports. We think plaintiffs are reading the definition too literally and as a consequence are forcing a construction of the price support provisions which Congress never intended.

Plaintiffs conceded at oral argument that the Secretary could withhold price supports from peanuts which were not suitable either for cleaning, shelling, or crushing for oil. Implicit in this concession is a recognition that section 1359(c)'s definition of "peanuts" is not coterminous with those peanuts which are eligible for price supports. Furthermore, plaintiffs have also admitted that the Secretary has authority to limit price supports to only those peanuts which contain less than a specified percentage of moisture or foreign material.[14] If, despite the section 1359(c) definition of peanuts, the Secretary has the authority under the Act to withhold price supports from commercially unusable peanuts, and from peanuts with too much moisture or foreign matter, we fail to see why he does not also have the authority to order peanuts containing a toxin-producing mold ineligible for price supports.

In their reply brief and at oral argument, plaintiffs relied heavily on the legislative findings made by Congress in section 357 of the Act of April 3, 1941, 55 Stat. 88, to support their contention that the Secretary had no authority to declare seg. 3 peanuts ineligible for price supports. It was this Act which included peanuts within the marketing and price support scheme of the Agricultural Adjustment Act of 1938. The legislative findings of the 1941 Act are codified as 7 U.S.C. § 1357 (1976):

### § 1357. Legislative findings

The production, marketing, and processing of peanuts and peanut products employs a large number of persons and is of national interest. The movement of peanuts from producer to consumer is preponderantly in interstate and foreign commerce, and, owing to causes beyond their control, the farmers producing such commodity and the persons engaged in the marketing and processing thereof are unable to regulate effectively the orderly marketing of the commodity. As the quantity of peanuts marketed in the channels of interstate and foreign commerce increases above the quantity of peanuts needed for cleaning and shelling, the prices at which all peanuts are marketed are depressed to low levels. These low prices tend to cause the quantity of peanuts available for marketing in later years to be less than normal, which in

---

**13.** 7 U.S.C. § 1359(c) (1976) provides as follows:

"(c) The word 'peanuts' for the purposes of this chapter shall mean all peanuts produced, excluding any peanuts which it is established by the producer or otherwise, in accordance with regulations of the Secretary, were not picked or threshed either before or after marketing from the farm, or were marketed by the producer before drying or removal of moisture from such peanuts either by natural or artificial means for consumption exclusively as boiled peanuts."

**14.** 7 C.F.R. § 1446.7 (1975) defines peanuts which are eligible for price supports. It provides that they "shall be farmers stock peanuts * * * (1) Which contain not more than 10 percent moisture, and which if they have been mechanically dried, contain at least 6 percent moisture; (2) Which contain not more than 10 percent foreign material;" and "(7) Are free of visible *Aspergillus flavus* mold as determined by a Federal-State inspector."

turn tends to cause relatively high prices. This fluctuation of prices and marketings of peanuts creates an unstable and chaotic condition in the marketing of peanuts for cleaning and shelling and for crushing for oil in the channels of interstate and foreign commerce. Since these unstable and chaotic conditions have existed for a period of years and are likely, without proper regulation, to continue to exist, it is imperative that the marketing of peanuts for cleaning and shelling and for crushing for oil in interstate and foreign commerce be regulated in order to protect producers, handlers, processors, and consumers.

Plaintiffs contend that in these findings Congress expressed an intent to support the price of any and all peanuts which are suitable for at least one of the three uses for peanuts mentioned in the findings: (1) cleaning, (2) shelling, or (3) crushing for oil. Noting that defendant concedes that peanuts containing aflatoxin can be crushed for oil, which is aflatoxin-free and safe for human consumption, plaintiffs insist that seg. 3 peanuts are therefore entitled to full price supports.

This construction erected by plaintiffs on Congress' recitation in the legislative findings of the three uses for peanuts collapses when it is examined in the light of the legislative history of the 1941 Act. The House and Senate Reports on the bill which became the Act of April 3, 1941, demonstrate clearly that Congress was primarily concerned with supporting the price of peanuts used in the edible trade; it viewed the crushing of peanuts for oil only as a means of curtailing the movement of excess peanuts into the edible trade. Congress also was aware of the fact that instead of receiving the full support price for such excess peanuts, the farmer would be paid only the market price of peanuts crushed for oil, less expenses of storing, handling and selling.

In discussing the need for the imposition of marketing quotas, both the House and Senate Reports focus almost exclusively on the edible trade which the reports state

"consists of the manufacture of peanut butter, peanut candy, and salted or parched peanuts." H.R.Rep.No.147, 77th Cong., 1st Sess. 2 (1941); S.Rep.No.99, 77th Cong., 1st Sess. 3 (1941). The reports recite that the consumption of peanuts in the edible trade was stationary, while the acreage planted to peanuts was increasing. H.R.Rep.No.147 at 3; S.Rep.No.99 at 4. The reports further state that the Surplus Marketing Administration of the USDA "has indicated its incapacity and unwillingness to continue to undertake to remove the surplus [through diversion to oil], certainly not at the price level (about 50 percent of parity) which it had tried to support in the past," and that after the peanut growers had conferred with representatives of the USDA, the growers realizing that "they could not reasonably expect a surplus removal program without some control of the surplus, they have themselves presented the present bill as a plan to control and reduce, if not ultimately eliminate, the surplus." H.R. Rep.No.147 at 4; S.Rep.No.99 at 5. In the portion of the Reports entitled "Analysis of the Bill" both Reports discuss at length section 359(b), which the Act of April 3, 1941 added to the Agricultural Adjustment Act of 1938. H.R.Rep.No.147 at 6; S.Rep. No.99 at 7. Section 359(b), as amended, is codified as 7 U.S.C. § 1359 (1976). Section 359(b) was a relief provision from the marketing penalties imposed by section 359(a) for marketing peanuts in excess of quotas. The reports state that:

Subsection (b) of section 359 provides that the producers will be relieved of the payment of the 3 cents per pound penalty for the marketing of excess peanuts, that is, for the marketing of peanuts grown on acreage in excess of the farm acreage allotment, if they will deliver and market such excess peanuts through an agency or agencies designated by the Secretary. This, of course, is necessary in order to prevent such excess peanuts from moving into the edible trade unless it should appear that the peanuts produced on the allotted acreage is [sic] insufficient to supply the edible trade and at a price fair to the producer and to the consumer.

The peanuts received by such agency shall be sold by it for crushing for oil. This removes them from the available supply and at the same time, saves the grower who has inadvertently or by intention harvested peanuts in excess of his marketing quota from sustaining a total loss of such excess. *For such excess peanuts the producer will be paid the market value thereof for crushing for oil as of the date of delivery, less the estimated cost of storing, handling, and selling.* (Emphasis supplied.) [H.R.Rep.No.147 at 6; S.Rep.No.99 at 7.]

We think these excerpts collectively demonstrate that the references in the legislative findings to the crushing of peanuts for oil amount only to a recognition by Congress that the crushing of peanuts for oil was a means of diverting peanuts grown in excess of the acreage allotment from the principal market for peanuts, the edible trade. This interpretation finds support in the third sentence of the legislative findings, where Congress stated that "as the quantity of peanuts marketed in the channels of interstate and foreign commerce increases above *the quantity needed for cleaning and shelling*, the prices at which all peanuts are marketed are depressed to low levels." (Emphasis added.) 7 U.S.C. § 1357 (1976). Plaintiffs' contention that section 1357 requires full price support for peanuts suitable only for crushing for oil must therefore be rejected.[15]

Plaintiffs also argue that the regulations promulgated by the Secretary, discussed *supra*, which condition price supports for certain commodities on the commodity being free of toxin-producing molds or other poisonous substances are irrelevant to the Secretary's authority over peanuts. Plaintiffs assert three distinctions between peanuts and the other commodities, the quality of which the Secretary has regulated:

(1) For the other commodities, the quality conditions are within human control.

(2) For the other commodities, the quality conditions are for the most part aimed at those responsible for storage, not those responsible for production.

(3) For the other commodities, the farmer's harvest is not federally inspected when it is brought to the storage site.

Assuming all of these distinctions to be valid, the short answer to plaintiffs' argument is that the distinctions are nevertheless immaterial. Plaintiffs offer no acceptable explanation as to why the Secretary's authority under section 1421, a provision applicable to the price support of all agricultural commodities, should vary in accordance with these distinctions between peanuts and the other commodities which are price supported. We find no basis for such a construction in either the statute or the legislative history of the 1941 Act. To the contrary, both the House and Senate Reports, in speaking of the loan provisions of the 1941 Act state: "These provisions as to loans on peanuts are almost identical with present provisions of the [Agricultural Adjustment Act of 1938] relating to loans on cotton, corn, and wheat, and are within limitations therein provided." H.R.Rep. No.147 at 7; S.Rep.No.99 at 8. While we recognize that each agricultural commodity is subject to a variety of individual statutory and administrative provisions, that does not alter the general applicability of section 1421, the basis for the Secretary's decision here.

Plaintiffs' final argument on the issue of the Secretary's statutory authority to withhold price supports from peanuts containing *A. flavus* is that USDA disregarded its own administrative practice of providing price supports to peanuts crushed for oil. Plaintiffs argue that this long-standing administrative practice is entitled to great weight and cite our decision in *Duncan v. United States*, 220 Ct.Cl. ——, ——, 597 F.2d 1337, 1342 (1979), *vacated and remanded* —— U.S. ——, 100 S.Ct. 1827, 64 L.Ed.2d 255 (1980).

---

**15.** This is not to suggest of course that the Secretary lacks authority to support the price of peanuts suitable only for crushing. We simply reject plaintiffs' contention that section 1357 requires him to do so.

Plaintiffs' error lies in assuming that USDA's past support of peanuts to be crushed for oil was based on the Department's view that it was *required* to provide support for such peanuts. As stated previously in this opinion, this contention is contrary to the record. Moreover, the 1974 letter of USDA's General Counsel to the Chairman of the House Committee on Agriculture, discussed *supra*, indicates that USDA believed such support to be discretionary. In any event, plaintiffs have not supplied any affidavits or other evidence which would suggest that there is a triable issue of fact on this point. Consequently, there is no basis upon which we can conclude that USDA changed its interpretation of its statutory authority to declare that seg. 3 peanuts were ineligible for price supports.

In sum, while plaintiffs have offered a variety of arguments in support of their contention that the Secretary lacked statutory authority to deny price supports to seg. 3 peanuts, we find all of these arguments unpersuasive. We therefore hold that the applicable law authorized the Secretary to deny price supports to peanuts containing visible *A. flavus* mold.

### IV.

Plaintiffs have advanced several alternative grounds for recovery which we find are also without merit for the reasons to be discussed.

A. *Claims based on the 24-hour rule.*

In 1973, after the Secretary had provided for a $50 deduction for that year in the level of price supports for seg. 3 peanuts, it was found that many of the producers, after learning that their peanuts were graded seg. 3, would have them retested at one or more different buying points in the hope of receiving a grade of seg. 1 or seg. 2 through sampling error. In order to improve the controls on the marketing of seg. 3 peanuts in the United States, the Secretary on July 15, 1974, promulgated a regulation which stated that it was essential that peanuts sold for commercial purposes remain free of contamination by peanuts containing *A. fla-*

*vus* mold because of the adverse effect on the market which would result from seizure or other Government action with respect to the contaminated peanuts. 39 Fed.Reg. 27807 (1974), 7 C.F.R. § 1446.13 (1975).

The regulation further provided that as a condition of the eligibility of his peanuts for price support, the farmer whose peanuts were classified as seg. 3 peanuts was required either (1) to sell the peanuts to a signer of the Peanut Marketing Agreement or turn them over to the local cooperative marketing association, or (2) to clean the load of peanuts containing the mold. *Id.* If the farmer elected to take the load away for cleaning, he had to return to the same buying point for a second inspection by the close of the following workday. *Id.* Thus, the regulation came to be known as the "24-hour rule." If the peanuts still tested as seg. 3 peanuts, the farmer was then required to sell them to a signer of the Peanut Marketing Agreement or turn them over to the cooperative marketing association for crushing for oil. *Id.*

Plaintiffs maintain that the 24-hour rule precluded them from taking the seg. 3 peanuts home for seed as in prior years; that the rule did not allow plaintiffs sufficient time, while they were harvesting the remainder of their crops, to clean the peanuts by removing the damaged peanuts, and that the 24-hour rule did not allow them enough time to have their peanuts chemically tested to determine whether aflatoxin was present, and if so, in what amounts. Consequently, plaintiffs say that their only real alternative was to sell the seg. 3 peanuts to be crushed for oil at a price far below the support price for seg. 1 and seg. 2 peanuts. Plaintiffs declare that the disposition of their peanuts under such circumstances was a forced sale, which constituted a taking of their property without just compensation and a denial of due process, contrary to the Fifth Amendment of the Constitution.

Plaintiffs' second contention regarding the 24-hour rule is based on the different treatment accorded to them and to shellers with respect to seg. 3 peanuts. The Peanut Marketing Agreement required shel-

lers/handlers to conduct a chemical test for aflatoxin before peanuts intended for human consumption could be resold. Peanuts found to contain unacceptable levels of aflatoxin as a result of this chemical analysis under the terms of the agreement could be commercially blanched or re-milled and the contaminated kernels removed. If aflatoxin was discovered on peanuts grown for seed, shellers were permitted to sell the peanuts for seed or to bring the residue not used for seed peanuts up to standard requirements for use in the edible trade. If the shellers were unable to bring the load of peanuts up to USDA standards, they were indemnified from a fund maintained by the shellers for this purpose. There is no similar fund for farmers whose peanuts are found to contain the *A. flavus* mold. Plaintiffs assert that the unequal treatment accorded to farmers and to shellers under the circumstances discriminated against the plaintiffs and denied them equal protection and due process of law as guaranteed by the Fifth Amendment.

We reject these contentions for several reasons. This court has no jurisdiction over claims based upon the Due Process and Equal Protection guarantees of the Fifth Amendment, because these constitutional provisions do not obligate the Federal Government to pay money damages. *Walton v. United States*, 213 Ct.Cl. 755 (1977); *Muehlen v. United States*, 209 Ct.Cl. 690 (1976); *Eastport S. S. Corp. v. United States*, 372 F.2d 1002, 178 Ct.Cl. 599 (1967).

Moreover, we conclude that the enforcement of the regulation, including the 24-hour rule, was not such an onerous and unreasonable restriction on the use of plaintiffs' property as to constitute a Fifth Amendment taking. We have no doubt that the Secretary was authorized by 7 U.S.C. § 1357 (1976) and 7 U.S.C. § 1421 (1976) to regulate the marketing of seg. 3 peanuts for the purpose of assuring that contaminated peanuts would not be sold for edible purposes. Through their participation in the price support program, plaintiffs were familiar with the terms and conditions of the program and knew that if they ac-

cepted the benefits of price supports for seg. 1 and seg. 2 peanuts, they would have to suffer the loss entailed in selling the seg. 3 peanuts at the price paid for crushing nuts. They were paid the market price for such peanuts, and although they refer to the transactions as forced sales, their property was not confiscated or appropriated by the Government. It is well settled that lawful regulatory action does not constitute a compensable taking merely because the result is to diminish the value of private property, reduce profits, or prevent the most beneficial use of such property. *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978); *Goldblatt v. Town of Hempstead*, 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962); *Bowles v. Willingham*, 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892 (1944). Especially in cases where there has been no direct appropriation of property by governmental agencies, consequential damages resulting from the exercise of lawful regulations are not compensable takings within the purview of the Fifth Amendment. *Basin, Inc. v. Federal Energy Admin.*, 552 F.2d 931 (Em.App.), *cert. denied*, 434 U.S. 821, 98 S.Ct. 64, 54 L.Ed.2d 78 (1977); *Condor Operating Co. v. Sawhill*, 514 F.2d 351 (Em. App.), *cert. denied*, 421 U.S. 976, 95 S.Ct. 1975, 44 L.Ed.2d 467 (1975); *Mosca v. United States*, 417 F.2d 1382, 189 Ct.Cl. 283 (1969); *cert. denied*, 399 U.S. 911, 90 S.Ct. 2197, 26 L.Ed.2d 565 (1970).

B. *The implied contract claim.*

Plaintiffs contend that an implied in fact contract was created between them and defendant, whereby plaintiffs were induced to become "cooperators" within the meaning of 7 U.S.C. § 1428(b) (1976) by restricting their planting of peanuts to comply with the acreage allotments and in return, defendant agreed to pay the plaintiffs the price supports mandated by 7 U.S.C. § 1441(b) (1976). Relying on *Martin v. Bergland*, No. 77–4222 (D.Kan., filed May 7, 1979), *appeal docketed* (10th Cir.), defendant argues that the contract doctrine has no application to a dispute concerning pay-

ments made by USDA under a farm program. We find it unnecessary to decide this question of law, because in order to dispose of this particular claim, we shall assume as legally correct the statement in plaintiffs' brief that "once a producer takes the positive steps to become a 'cooperator' pursuant to 7 U.S.C. § 1428(b), he has accepted the Government's offer made by the statute and regulations, and a contractual obligation to pay price supports arises in fact." [16]

Nevertheless, the fatal flaw in plaintiffs' claim is that the offer incorporated the regulations, and no contract existed because the Secretary did not agree to provide price supports for seg. 3 peanuts. The cases relied on by plaintiffs, including *Radium Mines, Inc. v. United States*, 153 F.Supp. 403, 139 Ct.Cl. 144 (1957); *Griffin v. United States*, 215 Ct.Cl. 710 (1978), as well as *Martin v. Bergland, supra*, hold that the regulations are an integral part of the offer. *Aycock-Lindsey Corp. v. United States*, 171 F.2d 518 (5th Cir. 1948) and *New York Airways, Inc. v. United States*, 369 F.2d 743, 177 Ct.Cl. 800 (1966) cited by plaintiffs, do not support plaintiffs' position, because in each of them, the acceptances of the plaintiffs conformed to the terms and conditions of the offers, which included the agency regulations.

Plaintiffs recognize that in order to prevail, even on their theory, they must establish that the regulations were not authorized by the applicable statutes. Since we have decided to the contrary, it follows that plaintiffs are not entitled to recover on their implied contract claim.

## V.

There remains for disposition plaintiffs' claim regarding the validity of the testing procedures utilized by USDA for determining whether a load of peanuts is contaminated with aflatoxin. As previously stated, when a farmer brought in a load of peanuts, the inspector searched for signs of visible *A. flavus* mold with the aid of a microscope. Plaintiffs contend that this testing procedure was arbitrary, capricious and unreasonable, and therefore that it deprived them of the price supports to which they were entitled. Defendant answers that the tests were accurate, administratively feasible, and reasonable under all of the circumstances. Defendant supports its contentions with an affidavit to the effect that a high-powered microscope was used by the inspector and that the visual test was appropriate to detect the presence of aflatoxin, since it will almost always be found where there is visible *A. flavus* mold. It is also averred that the visual test has been found to be 93 percent accurate and that chemical testing is so complex and time-consuming that it would be unfeasible in the context of marketing farmers' stock peanuts. In affidavits made by plaintiffs' experts, these statements are sharply disputed; plaintiffs' affiants state that the inspectors of the Federal-State Inspection Service who inspected plaintiffs' peanuts were incapable of making a correct identification of the mold because of their lack of education and experience in the field, and because of the inadequate microscopes used; that a trained pathologist would need a compound microscope, which is much more powerful, to identify *A. flavus*; that the presence of the mold does not mean that aflatoxin compounds are present, and that a chemical analysis is the only sound, accurate way to determine the presence of aflatoxin.

In view of these conflicting affidavits, we find that this issue cannot be resolved on the pending motions for summary judgment and that it must be remanded to the Trial Division for trial or other disposition.[17]

---

**16.** Plaintiffs' Brief at p. 49.

**17.** We reject defendant's contention that judicial examination of plaintiffs' allegation that the testing procedures were arbitrary and capricious is prohibited. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971); *Gross v. United States*, 505 F.2d 1271, 1279, 205 Ct.Cl. 605, 618 (1974); *Hiatt Grain & Feed, Inc., supra*, 446 F.Supp. at 478–79.

## CONCLUSION

With respect to the issue involving the testing procedures for seg. 3 peanuts, the cross-motions for summary judgment are denied and the question is remanded to the Trial Division for trial or other disposition. That part of defendant's motion which is based on the defense of laches is denied. As to all other issues presented, defendant's motion for summary judgment is granted, and plaintiffs' cross-motion for summary judgment is denied. Entry of final judgment will be deferred pending determination of the issue which is remanded.