**STATE OF ALABAMA, et al.,
Plaintiffs,**

v.

**Otis R. BOWEN, et al., Defendants.**

Civ. Action No. 86–0841.

United States District Court,
District of Columbia.

Nov. 26, 1986.

Charles A. Miller, Robin J. Armbruster, Covington & Burling, Washington, D.C., for Alabama.

Deborah M. Miron, Sp. Litigation Section, Washington, D.C., for D.C.

Francis X. Bellotti and Leah W. Sprague, Boston, Mass., for Mass.

Brian Kennedy, Sheila Lieber, Washington, D.C., for Bowen.

**MEMORANDUM**

OBERDORFER, District Judge.

Plaintiffs are twenty nine states,[1] the District of Columbia, and four counties in California.[2] Defendants are the Secretary of the Department of Health and Human Services ("HHS"), HHS itself, and other government health agencies and administrators responsible for administration of the Medical Assistance ("Medicaid"), 42 U.S.C. § 1396 *et seq.*, and Aid to Families with Dependent Children ("AFDC"), 42 U.S.C. § 601 *et seq.*, programs.

Plaintiffs have filed a motion for summary judgment seeking a declaration invalidating regulations designed to recover from states part of the federal share of Medicaid and AFDC disbursements to ineligible recipients. *See* 42 C.F.R. § 431.802 (Medicaid) and 45 C.F.R. § 205.42 (AFDC). Plaintiffs' Motion for Summary Judgment (filed June 25, 1986). Defendants have moved to dismiss the complaint primarily on the grounds that the matter is not yet ripe for review and that if it is ripe, plaintiffs' claim is barred by laches. Defendants' Motion to Dismiss (filed June 18, 1986). While there is a great deal of recent and thoughtful analysis on issues of ripeness and pre-enforcement review,[3] there has been little discussion of the specific issue raised here. Able counsel for both parties have briefed the issue and the Court has heard oral argument. Upon consideration of defendants' motion to dismiss and plaintiffs' opposition thereto, and for reasons stated below, the Court concludes that plaintiffs' challenge is not ripe. Accordingly, defendants' motion to dismiss is granted.

1. The plaintiff states are: Alabama, Alaska, Colorado, Connecticut, Florida, Hawaii, Idaho, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, New Jersey, New Mexico, New York, Ohio, Oklahoma, Rhode Island, South Dakota, Tennessee, Texas, Utah, Vermont, Washington, West Virginia, and Wisconsin. Second Amended Complaint (filed May 27, 1986).

2. Imperial, Merced, Riverside, and San Bernardino counties. Defendant challenges the stand-

ing of these counties. *See* Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss at 35–40 (filed June 18, 1986). Because of the disposition of this case, it is unnecessary to resolve that issue.

3. *See, e.g., State Farm Mutual Automobile Insurance Co. v. Dole,* 802 F.2d 474 (D.C.Cir.1986); *Ciba-Geigy Corp. v. United States Environmental Protection Agency,* 801 F.2d 430 (D.C.Cir.1986).

## I.

The federal government contributes matching funds for all payments under AFDC and Medicaid programs. These programs are administered by the states. In an effort to reduce fraud and waste in the administration of these programs, the federal government has implemented a succession of systems to recover from states the share of federal matching funds attributable to payments to ineligible recipients in excess of a certain percentage of the total disbursement. In 1979, the federal government determined the effective "error rate" to be the national average of such errors. This average rate was 6.4 percent for AFDC and 15.7 percent for Medicaid. 44 Fed.Reg. 12578, 12579 (March 7, 1979). If a state's payments to ineligible recipients exceeded the national average, it was required to reimburse the federal government's share of that payment unless it could show that it was making significant efforts to reduce its level of erroneous payments. That scheme, based on the floating national average error rate, is not challenged by plaintiffs here. The focus of plaintiffs' challenge is that scheme's successor.

In 1980, HHS replaced the floating national average error rate with a standard 4 percent rate. Under this scheme, states were liable for the federal share of any payments in excess of the 4 percent rate of error.[4] The 4 percent standard was incorporated by reference into the Michel Amendment, which was part of the FY 1980 Appropriations Bill, H.R. No. 4389.

Departments of Labor and Health, Education, and Welfare and Related Agencies Appropriations bill, 1980, H.R. 4389. This bill was not enacted. However, a Continuing Resolution for Fiscal Year 1980 provided for appropriations to HEW "to the extent and in the manner, provided for" in the unenacted FY 1980 Appropriations Bill (H.R. 4389). Pub.L. 96–123, § 101(g), 93 Stat. 925 (1979).

In January, 1980, HEW adopted the regulations here at issue. 45 Fed.Reg. 6326 (Jan. 25, 1980).[5] HEW explained its reasoning as follows:

The Department is required to implement the Michel Amendment directive. Even though the FY 1980 Appropriations Bill, which includes the Michel Amendment directive in section 201 has not been enacted, imposition of the directive is law by virtue of the provisions in the Continuing Resolution (Pub.L. 96–123) which appropriates funds for HEW for FY 1980. Section 101(g) provides funds for HEW "to the extent and in the manner" provided for in the Labor-HEW Appropriation Bill.... Since the Appropriations Bill includes the Michel Amendment directive, we are obligated to issue regulations in implementation of that directive.

*Id.* at 6329. Although the 1980 regulations were the subject of comment and were eligible for judicial review, none of the plaintiffs challenged it in court until they filed this complaint.

Since 1980, Congress has enacted additional legislation with respect to error rates

---

**4.** The 4 percent rate originated in a conference report on the 1979 Supplemental Appropriations Act, Pub.L. No. 96–38, 93 Stat. 143. H.R.Conf. Rep. No. 331, 96th Cong., 1st Sess. 34–35 (1979) ("1979 Conference Report"). That report purported to direct HHS's predecessor (the Department of Health, Education and Welfare ("HEW"))

to issue regulations requiring that all States must reduce their AFDC and Medicaid erroneous excess payment rates to 4% by September 30, 1982, in equal amounts each year beginning in fiscal year 1980. If the States fail to make the required reductions, penalties shall be applied equal to the amount the federal share exceeds the dollar error rate for the year or years in question.

*Id.* at 34. Thereafter, on August 2, 1979, the House of Representatives adopted the so-called Michel Amendment. *See* Departments of Labor and Health, Education, and Welfare and Related Agencies Appropriations bill, 1980, H.R. 4389. That amendment reduced the budget authority of HEW and provided that the requirements contained in the 1979 Conference Report with respect to error rates be "carried out."

**5.** The regulation required the states to begin to reduce error rates with the objective of maintaining a 4 percent error rate by September 30, 1982. The regulation authorized waivers of this requirement in certain "extraordinary circumstances" and some other adjustments upon a showing of good faith. 45 Fed.Reg. at 6327.

for recovery of payments to the ineligible. The Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA"),[6] reduced the allowable error rate for AFDC payments to 3 percent, effective for fiscal year 1984. TEFRA specifically provided that the 1980 AFDC regulations

> shall remain in effect with respect to erroneous payments made by States until new regulations reflecting the changes made by ... [TEFRA] are promulgated and placed in effect.

§ 156(e), 96 Stat. 399.

More recently, the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"),[7] provided for studies by the Secretary of HHS and the National Academy of Sciences to recommend ways to control excessive levels of erroneous AFDC and Medicaid payments. Of special relevance here, COBRA provided for a two-year moratorium during which the Secretary is barred from reducing AFDC payments to States because of erroneous payments. § 12301(b), 100 Stat. 291–92. Finally, COBRA requires the Secretary to amend the AFDC and Medicaid error rate regulations retroactively so that any ultimate adjustments for all years subsequent to 1980 will be made on principles to be established as a result of the COBRA studies. § 12301(c), 100 Stat. 292.

Despite the COBRA studies, moratorium, and prospect of new regulations, HHS has undertaken to enforce the 4 percent error rate regulations for fiscal year 1981, and has indicated an intention to enforce the regulations for 1982 as well.[8] Those states which have been notified of possible liability and which have been denied waivers have taken administrative appeals to the Grant Appeals Board created for this pur-

pose pursuant to 42 U.S.C. § 1316(d). Discovery and other preliminaries to a Board decision on the merits are in progress. Those challenges primarily concern the method by which liability is determined under the regulations. In plaintiffs' motion for summary judgment, however, they challenge the validity of the regulations themselves. Plaintiffs argue that the 4 percent regulations as applied to 1981 and 1982 have no statutory basis and are an impermissible exercise of the Secretary's rule-making authority. Plaintiffs' Motion for Summary Judgment at 2. This issue will not be addressed by the HHS Departmental Grant Appeals Board.[9]

Defendants move to dismiss on the grounds that: (1) there has been no final administrative action because the Board's proceedings are in progress and plaintiffs are protected from significant financial consequences by the moratorium and the possibility that the COBRA studies and regulations will provide relief. (2) Even if there has been final agency action, plaintiffs' challenge to the regulations is not ripe for review, citing *Alascom, Inc. v. FCC*, 727 F.2d 1212 (D.C.Cir.1984). In addition, defendants argue that relief is barred by laches as a result of the failure of plaintiffs to seek judicial review of the 1980 rule-making prior to the regulations' expiration. Defendants' Motion to Dismiss (filed June 18, 1986).

In opposition, plaintiffs argue that the adoption of the regulations in 1980 was final agency action, and, furthermore, that the issue of their validity is a purely legal question which is ripe for review. Arguing in favor of ripeness, plaintiffs emphasize that a decision invalidating the regulations will obviate the need for costly and com-

---

**6.** Pub.L. No. 97–248, §§ 133, 156, 96 Stat. 373, 398 (1982).

**7.** Pub.L. No. 99–272, § 12301, 100 Stat. 291 (1986).

**8.** The AFDC error rate disallowances for the plaintiff states for fiscal year 1981 totaled $31,-851,716; the Medicaid disallowances for the same period totaled $11,920,783. Plaintiffs' Statement Of Material Facts As To Which There Is No Genuine Dispute at ¶¶ 7, 8. (filed June 25, 1986) (hereinafter "Plaintiffs' Statement").

Disallowances under these two programs for plaintiff states in fiscal year 1982 could total $85,000,000. Plaintiffs' Statement at ¶¶ 9, 10.

**9.** *See* Departmental Grant Appeals Board Ruling On Preliminary Jurisdictional Issues, Quality Control Disallowances 6–7 (dated October 17, 1985) (Exhibit B to Defendants' Motion to Dismiss (filed June 18, 1986)); (Attachment 10 to Plaintiffs' Motion for Summary Judgment (filed June 25, 1986)).

plex administrative and judicial proceedings. Plaintiffs' Opposition to Motion to Dismiss at 13 (filed June 30, 1986) (hereafter "Opposition"). Plaintiffs also claim that the pendency of the disallowance notices requires them, in effect, to maintain in reserve sufficient funds to pay claims which already amount to $43 million for 1981 and threatened claims of $85 million for 1982, and that having to keep these funds in reserve prevents them from meeting their responsibilities to their needy and ailing citizens. Opposition at 15.

## II.

### A.

■ The issue here is the ripeness of a pre-enforcement challenge to expired regulations. Plaintiffs vigorously urge that this Court should rule now on whether Congress authorized the disputed regulation because it was a final agency rulemaking subject as such to judicial review at this time. Plaintiffs correctly contend that the 1980 regulation is final in the sense that no factual development or further administrative action is necessary to frame or illuminate the question of whether Congress authorized the 1980 regulations. *See Abbott Laboratories v. Gardner*, 387 U.S. 136, 149, 151, 87 S.Ct. 1507, 1515, 1516, 18 L.Ed.2d 681 (1967); *Atlantic Richfield Co. v. United States Department of Energy*, 769 F.2d 771, 783 (D.C.Cir.1984). But finality is not a sufficient ground for pre-enforcement review. In *Alascom*, 727 F.2d at 1217, the Court of Appeals noted that final agency action and the existence of a purely legal question does not necessarily render a dispute ripe for judicial review.

> A case may lack ripeness ... even when it involves a final agency action presenting a purely legal question. The second prong of the ripeness test requires that the contested action impose an impact on the parties "sufficiently direct and immediate as to render the issue appropriate for judicial review at this stage."

727 F.2d at 1217 (quoting *Abbott Laboratories*, 387 U.S. at 152, 87 S.Ct. at 1517) (footnotes omitted). Examining the Supreme Court's decision in *Abbott Laboratories*, the Court of Appeals then concluded:

> Thus, to be ripe for review an administrative action must impose an actual, not a prospective, hardship by creating a dilemma in which a party "must choose between disadvantageous compliance and risking serious penalties" for noncompliance.

727 F.2d at 1217–18 (quoting 4 K. Davis, Administrative Law Treatise § 25:6, at 369 (1983)) (footnote omitted).

The rationale for pre-enforcement review is entirely absent here. *Abbott Laboratories* noted the serious dilemma facing a party who believes that a regulation is invalid and yet cannot challenge it without exposing himself to serious penalties. Plaintiffs do not confront this or a similar dilemma. The regulations challenged here expired in 1982. The only effect that the validity of these regulations will have is in determining plaintiffs' liability for past acts.

The possibility that plaintiffs will retain, instead of disbursing, some of the funds in order to build a reserve is a possibility worthy of consideration. Plaintiffs also cite the expense of litigation if they go through the administrative process only to find later that the underlying regulations are not valid. Plaintiffs' pragmatic concerns have some appeal, but not enough. The need to establish reserves and the expense of litigation are not the kind of hardships that pre-enforcement review was designed to alleviate. *See FTC v. Standard Oil Co.*, 449 U.S. 232, 242, 243–44, 101 S.Ct. 488, 494, 495, 66 L.Ed.2d 416 (1980).

Moreover, Supreme Court admonitions against piecemeal review counsel against review at this time. *See Standard Oil*, 449 U.S. at 242, 101 S.Ct. at 494. While plaintiffs argue that piecemeal review is not a danger here because a decision striking down the regulations would terminate the administrative proceedings, this argument assumes that the regulations are indeed invalid. If, as seems likely, this Court, or an appellate court, should find that Congress did authorize the regulation (albeit in

an unconventional way), no useful purpose would have been served by review of the regulations at this time.

In this case plaintiffs waited six years after the regulations were promulgated and four years after they expired to challenge their validity. It is clear that this challenge was prompted by the initiation of enforcement proceedings, and, if successful, would have the effect, if not the purpose, of interrupting and ending those proceedings. A court should hesitate to permit enforcement proceedings to be diverted in this manner. For as the Supreme Court has warned, judicial review may not be used as "a means of turning prosecutor into defendant before adjudication concludes." 449 U.S. at 243, 101 S.Ct. at 494.

Moreover, there is no showing that plaintiffs have asked the Board to suspend proceedings pending the outcome of the studies and the revised regulations contemplated by COBRA, developments which could radically change the issues before the Board, or precipitate new action by Congress or by the Secretary, either of which could completely moot the pending litigation.

### B.

■ Finally, defendants argue that plaintiffs' challenge is barred by the doctrine of laches.[10] While it is not necessary to reach that issue, plaintiffs delay in initiating this suit counsels against pre-enforcement review and interruption of the administrative proceedings now pending.

Although probably more relevant to the merits than to the laches defense, it is nevertheless germane that Congressman Michel chose not to reiterate his 1980 fiscal year bill in 1981 because he considered the then-unchallenged 1980 regulation to be in

place. 126 Cong.Rec. 23462 (1980). The Senate Appropriations Committee also evidenced its understanding that the 4 percent error rate was operational.

The Administrative Procedures Act afforded plaintiffs access to judicial review of the 1980 regulation when it was adopted and while the Concurrent Resolution of 1979 remained viable. Plaintiffs' unusual contention that none of them was originally aggrieved by the adoption of the regulation is not persuasive. When the average error rate before 1980 was historically 6.7 percent for AFDC and 15.7 percent for Medicaid, some of the plaintiff states were obviously threatened and aggrieved by the 4 percent error rate established by the 1980 regulation. There may be circumstances in which a state could, in effect, obtain judicial review of a rule-making decision five or six years after the rule became effective. However, here, the authorizing legislation has expired.[11] While the Court expresses no opinion on whether the laches defense would preclude *post*-enforcement review of the challenged regulations, it is clear that it is too late for the pre-enforcement review sought by plaintiffs. Accordingly, an accompanying order will grant defendants' motion to dismiss.

### ORDER

For the reasons stated in the accompanying Memorandum, it is this 26th day of November, 1986, hereby

ORDERED: that plaintiffs' motion for summary judgment should be, and is hereby, DENIED; and it is further

ORDERED: that defendants' motion to dismiss should be, and is hereby, GRANTED; and it is further

---

**10.** The plaintiffs' technical contentions that the states' sovereignty precludes an otherwise valid defense of the United States in the nature of laches or that laches is an affirmative defense inappropriate for resolution in a motion to dismiss are both without merit. *See Block v. North Dakota,* 461 U.S. 273, 289–90, 103 S.Ct. 1811, 1820–21, 75 L.Ed.2d 840 (1983) (state sovereignty no bar to laches); *Doe v. Department of Justice,* 753 F.2d 1092, 1115 (D.C.Cir.1985) (af-

firmative defense can be mounted in a motion to dismiss).

**11.** In 1982 and 1983, the Executive has proposed, and Congress has enacted, other legislation on the same subject on the clear understanding that the validity of the 1980 regulation was unchallenged. HHS has proceeded to enforce the regulation while re-evaluation ordained by Congress is also in progress.

ORDERED: that this complaint should be, and is hereby, DISMISSED.