Ray T. **BOYD**, Charles Michael Hines, James E. Kelly d/b/a Kelly Farms, and Sessions Company, Inc., Plaintiffs,

American Peanut Shellers Association, Intervenor,

v.

Dan **GLICKMAN**, as Secretary of the United States Department of Agriculture; Keith Kelley, as Executive Vice–President of the Commodity Credit Corporation; Keith Kelley, as Administrator of Farm Service Agency; The United States Department of Agriculture; The Commodity Credit Corporation and The Farm Service Agency, Defendants.

Civil Action No. 98–A–83–S.

United States District Court, M.D. Alabama, Southern Division.

July 9, 1998.

M. Dale Marsh, Cassady, Fuller & Marsh, Enterprise, AL, for Ray T. Boyd, Charles Michael Hines, James E. Kelly, Kelly Farms and Sessions Co., Inc.

Thomas W. Millet, Department of Justice, Civil Division, Washington, DC, Kenneth E. Vines, U.S. Attorney's Office, Montgomery, AL, Lois Bonsal Osler, U.S. Department of Justice, Civil Division, Federal Programs Branch, Washington, DC, for Dan Glickman, Keith Kelly, U.S. Dept. of Agriculture, Commodity Credit Corp. and Farm Service Agency.

Michael R. McLeod, Richard E. Pasco, Richard T. Rossier, American Peanut Product Manufacturers, Inc., Washington, DC, for American Peanut Product Manufacturers, Inc., amicus.

George R. Reinhardt, Jr., Reinhardt, Whitley, Wilmot & Summerlin, P.C., Tifton, GA, for Alabama Peanut Producer Ass'n, amicus, Florida Peanut Producers Ass'n, amicus, George Agricultural Commodity Com'n for Peanuts, amicus and GFA Peanut Ass'n, amicus.

Fred J. Clark, Washington, DC, for Georgia Peanut Producers Ass'n, amicus, New Mexico Peanut Growers Ass'n, amicus, Oklahoma Peanut Growers Ass'n, amicus, Texas Peanut Growers Ass'n and Southwestern Peanut Growers Ass'n, amicus.

Evans J. Plowden, Jr., Dawn G. Benson, Russell S. Kent, Watson, Spence, Lowe & Chambless, L.L.P., Albany, GA, for American Peanut Shellers Ass'n.

## MEMORANDUM OPINION

ALBRITTON, Chief Judge.

### I. INTRODUCTION

This cause is before the court on a Motion to Dismiss the Plaintiffs' Complaint, which is being treated as a Motion for Summary Judgment,[1] and a Motion to Dismiss the Intervenor's Complaint, also being treated as a Motion for Summary Judgment, filed by the Defendants Dan Glickman, in his official capacity as Secretary of the United States Department of Agriculture; and Keith Kelley, in his official capacity as Executive Vice–President of the Commodity Credit Corporation ("CCC"), and Administrator of the Farm Service Agency; USDA, CCC and the Farm Service Agency (collectively "the Defendants").

The Plaintiffs Ray T. Boyd, Charles Michael Hines, James E. Kelley d/b/a Kelley Farms, and Sessions Company, Inc. ("Plaintiffs") filed their Complaint on January 28, 1998. The Plaintiffs bring claims against the Defendants, alleging that the Defendants have acted arbitrarily and capriciously in the method by which they inspect and classify peanuts or permit that to be done, (Count I), and that the Defendants have acted arbitrarily and capriciously in treating peanut growers differently from peanut shellers (Count II), and that a justiciable controversy exists as to rights and obligations under USDA regulations (Count III). Plaintiffs seek declaratory and injunctive relief.

On January 28, 1998, the Plaintiffs filed a Motion for a Temporary Restraining Order and a Preliminary Injunction. The court granted the Motion for a Temporary Restraining Order and then entered an Order extending the Temporary Restraining Order until April 2, 1998.

On March 2, 1998, the American Peanut Shellers Association ("APSA") filed a Motion to Intervene which was granted on March 11,

---

1. Under the Federal Rules of Civil Procedure, if on a motion to dismiss, "matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment...." FRCP 12(b). Because the parties in this case submitted evidence in support of and in opposition to a Motion to Dismiss, this court entered an Order regarding each Motion to Dismiss giving the parties an additional two weeks to submit evidence and stating that the motion would be treated as a motion for summary judgment.

1998. The Intervenor, APSA, filed a Complaint on March 11, 1998.

The court has allowed the filing of Amicus Curiae Briefs by the American Peanut Product Manufacturers, Inc.; the Alabama Peanut Producers Association, Florida Peanut Producer Association, Georgia Agricultural Commodity Commission, and GFA Peanut Association; and the Georgia Peanut Producers Association, New Mexico Peanut Growers Association, Oklahoma Peanut Growers Association, Southwestern Peanut Growers Association, and the Texas Peanut Growers Association.

On June 30, 1998, the court held oral argument in this case on both motions for summary judgment.

For reasons to be discussed, the Motions for Summary Judgment are due to be GRANTED.

## II. *FACTS*

The submissions of the parties establish the following facts:

Plaintiffs Boyd, Hines, and Kelly are farmers who grow, harvest, and market peanuts in Coffee and Geneva Counties in the state of Alabama. Plaintiff Sessions Company, Inc. is a corporation which handles and shells peanuts. Defendant Glickman is the Secretary of the United States Department of Agriculture ("USDA"). Defendant Kelley is Executive Vice President of the Commodity Credit Corporation ("CCC") and the Administrator of the Farm Service Agency ("FSA").

The Plaintiffs in this case are challenging the support payments for their peanuts. As part of the Peanut Price Support Program, the Secretary of the USDA establishes a national marketing quota for peanuts that regulates the quality of edible peanuts that may be produced and marketed within the United States. The Secretary of the USDA provides price supports for peanuts through the CCC. The CCC makes warehouse storage loans to cooperative peanut marketing associations. When farmers bring their harvested peanuts to the buying point, there are two potential purchasers of the farmers' peanuts: a peanut shelling company or the United States Government. If the farmers do not sell their peanuts commercially, the farmers exchange the peanuts for a nonrecourse loan from the CCC at the support price set by Congress. The CCC and producer associations then sell the "loan" peanuts to recover the money paid in price support loans. Peanuts which exceed the quota peanut amount are known as "additional peanuts." Additional peanuts are eligible for price supports at a lower additional loan rate.

When the farmers tender their peanuts for purchase, each load is visually inspected by a representative of the Federal–State Inspection Service ("FSIS"). A sample is drawn from the load and the price support payment is computed based on the quality of the load. There are three categories into which peanuts may be placed: Segregation 1, Segregation 2, and Segregation 3. Segregation 1 peanuts are peanuts of good quality. Segregation 2 peanuts have suffered a prescribed level of damage. Segregation 3 peanuts are peanuts which have visible Aspergillus flavus mold ("*A.flavus*").

*A flavus* and *Aspergillus parasiticus* are molds which produce aflatoxin. Aflatoxin is a chemical compound which is carcinogenic and renders peanuts unfit for human consumption under standards established by the United States government. Although the molds produce aflatoxin, they do not always produce aflatoxin. The FSIS employees conduct a visual inspection of a farmer's peanuts by using a light microscope in order to detect the presence of *A. flavus* mold. The Plaintiffs contend that a back-up method to visual testing is required so that peanuts graded as Segregation 3 can be re-tested.

Over time, the United States government has developed regulations for determining price supports for Segregation 3 peanuts. In the past, the USDA has had a "24–hour rule" by which a peanut producer whose lot was classified as Segregation 3 could have the lot cleaned and returned for a second inspection on the next workday following the initial inspection. This policy was abolished by the USDA in the late 1970's. The Plaintiffs assert in their Complaint that the "24 hour rule" was abolished without use of the proper rule-making procedure. The Plaintiffs ask that this rule be re-instituted so that they

have an opportunity to clean peanuts graded as Segregation 3 peanuts.

Also relevant to price supports for peanuts are the availability of "disaster" transfers. In 1978, Congress provided that if a farmer had not used up his total quota at the end of the year through the total Segregation 1 production and retention of peanuts for seed use, the farmer could effect a "disaster" transfer by moving a volume of additional peanuts equal to the shortfall between the full quota and the actual quota marketings from the additional peanut pool to the quota pool. In the 1996 Farm Bill, Congress limited disaster transfers which had previously been available by limiting farmers with Segregation 3 peanuts to disaster transfers of up to 25% of the poundage allotted the farmer under his or her quota. Also, the loan amount for the Segregation 3 peanuts transferred cannot exceed 70% of the quota support price for the peanuts.

Although neither the Plaintiffs nor the Intervenor has petitioned the USDA for a rulemaking regarding any of these procedures, Randall Griggs of the Georgia Agricultural Commodity Commission for Peanuts and Carl Sanders of the Alabama Peanut Producers Association wrote a letter to the Secretary asking the USDA to allow them to clean their peanuts and have them regraded when peanuts are graded as Segregation 3. None of the parties contend that this letter was a petition for a rulemaking.

### III. *SUMMARY JUDGMENT STANDARD*

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323, 106 S.Ct. 2548. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322–23, 106 S.Ct. 2548.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. 2548. To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor. *Anderson v. Liberty Lobby,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

### IV. *DISCUSSION*

#### A. The Plaintiffs' Claims

The Defendants have urged this court to give the USDA's actions the requisite deference as outlined in the United States Supreme Court's decision in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Under *Chevron,* the court must first determine whether Congress has spoken directly to the question at issue. *Id.* at 837, 104 S.Ct. 2778. If the intent of Congress is clear, the court's inquiry is ended because the court and the agency must give effect to the unambiguously expressed intent of Congress. *Id.* If Congress does not clearly express its intent, the court defers to the

agency's interpretation if it is based on a permissible construction of the statute. *Id.* The Defendants contend that the issues before this court implicate only the second *Chevron* inquiry because Congress has not spoken directly to any of these issues. Under the second *Chevron* inquiry, the court does not simply impose its construction of the statute, but defers to the agency's construction if it is not arbitrary, capricious, or manifestly contrary to the statute. *Id.* at 844–45, 104 S.Ct. 2778.

■ There appear to be several different kinds of claims being brought in this case. As the Eleventh Circuit has explained, a challenge to an interpretation of an act and a challenge to the procedural propriety of an agency's rulemaking involve different standards of review. *Florida Manufactured Housing Assoc., Inc. v. Cisneros,* 53 F.3d 1565 (11th Cir.1995). The standard of review for an agency's interpretation of a statute is governed by the two-prong test in *Chevron. Id.* at 1571. An agency action promulgated under informal rulemaking procedures is reviewed in accordance with §§ 701–706 of the Administrative Procedure Act. The Administrative Procedure Act provides that an agency action may be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* at 1572 (quoting 5 U.S.C.A. § 706(2)(A)). Because some of the Plaintiffs' claims appear to implicate procedural rulemaking issues, while others implicate agency interpretation, the court will apply the applicable standard in the context of analyzing the relevant claims.

At oral argument, the Plaintiffs clarified for the court that their main and primary argument is the position articulated in their brief that the visual testing procedures of the USDA as administered by FSIS are inadequate, arbitrary and capricious, and while the Plaintiffs do not advocate total abolition of the visual testing procedure, they are requesting this court to take out the arbitrary nature of the procedure. *See* Plaintiffs' Addition Submission in Opposition to Summary Judgment, page 9. The Plaintiffs argue that with today's technology, the current method of inspecting peanuts is antiquated and has been proven inaccurate.

Also at oral argument, the Plaintiffs clarified that they have not sought to compel the USDA to conduct a rulemaking nor do they contend that the letter written to the Secretary by Randall Griggs and Carl Sanders was a request for a rulemaking. In other words, the Plaintiffs have not challenged the USDA's rulemaking, but have instead requested that this court declare the visual testing procedures used by the USDA for several years to be arbitrary and capricious in light of the technological advancements which have purportedly been made since the regulations were put in place.

The Defendants have argued that the true, but unarticulated reason that the Plaintiffs have filed suit is not that they believe that the USDA's actions with regard to Segregation 3 peanuts are arbitrary and capricious, but that the Plaintiffs are unhappy with Congress' decision in 1996 to limit "disaster" transfers. The Defendants argue that reliance on visual inspection of peanuts is reasonable and has been relied upon for decades. The Defendants contend that because Plaintiffs have no objection to visual inspection of all peanuts, but condemn it only when peanuts are graded Segregation 3, this selective challenge to visual inspection is irrational on its face. The Defendants also argue that visual testing is entirely reasonable since there is no established action level for chemical testing, and there is no indication that peanut farmers would be willing to bear the costs of chemical testing. The Defendants also state that nothing prevents the Plaintiffs from cleaning their peanuts before they are brought for sale and that cleaning costs about $30 a ton.

■ The court has outlined the basic contours of the dispute between the USDA and the Plaintiffs in order to demonstrate the specific factual nature of the primary claim brought by the Plaintiffs. As the court expressed at oral argument, the Plaintiffs' contentions present a question of reviewability which the parties, despite their in-depth discussion of the alternative ways to test for *A. flavus* mold, have not adequately addressed. The court's concerns stem from the fact that the Plaintiffs are not challenging a rulemaking, nor are they asking for this court to compel a rulemaking. They are not contend-

ing that the USDA's regulations were arbitrary and capricious at the time they were adopted. Instead, the Plaintiffs seek a declaration from this court that the current method of peanut inspection is, by today's technological standards, arbitrary and capricious. In other words, they contend that once-reasonable regulations have been rendered arbitrary and capricious by advancing technology and they ask the court to fashion a remedy.

As support for this court's authority to engage in such review, the Plaintiffs have cited a decision from the Court of Claims, *Carruth v. United States*, 224 Ct.Cl. 422, 627 F.2d 1068 (1980). In *Carruth*, the plaintiffs sued for the difference between the price support level and the price they actually received for their peanuts on the market when they were sold for crushing. *Id.* at 1073. The court concluded, based on conflicting affidavits as to the efficacy of visual testing, that material issues of fact precluded summary judgment in that case. *Id.* at 1082.

At oral argument, the Plaintiffs urged this court to conclude that their claim is identical to the claim in *Carruth* so that an entry of summary judgment is likewise inappropriate in this case. The court finds, however, that there are at least two significant distinctions between this case and *Carruth* that compel the conclusion that *Carruth* is not persuasive here.

The court in *Carruth* was the Federal Court of Claims. The claim being presented was a claim for money due the plaintiffs from the government, not a request to enjoin the Secretary's use of a testing method. While the court may have concluded that the conflicting affidavits precluded summary judgment in that case, the court does not explain its reasoning. *Id.* at 1082. However, since the claim was one for money due to be paid for a particular crop of peanuts, logically it may be that the court declined to grant summary judgment to either party because of the nature of the claim. In this case, the Plaintiffs have sought a declaration that the

current testing method is arbitrary and capricious and an injunction to require the USDA to use different procedures. Whether or not the Secretary of the USDA has acted arbitrarily and capriciously is a question of law. Therefore, while the Plaintiffs have pointed to *Carruth* as authority for finding that there are disputed issues of fact which preclude summary judgment and which present a question for review, this court does not find that a case where cross motions for summary judgment were denied on a claim for money before the Federal Court of Claims is persuasive authority in this administrative review case.[2]

Another significant distinction from *Carruth* relates to this court's role in reviewing the actions of the Secretary. At oral argument, the Plaintiffs were asked under what authority they can proceed directly before this court rather than first presenting their challenge to the Secretary's actions, on inactions, to the USDA. The Plaintiffs cited to *Carruth* wherein the court noted in a footnote that it rejected the defendant's contention that the court could not review the plaintiff's challenge to the testing procedures. *Id.* at 1082 n. 17. Again, it appears that the different procedural posture of *Carruth* is significant. The plaintiffs sought to recover money based on alleged denial of price support payments. One theory by which they sought to prove this was that the inspection of their peanuts was conducted in an arbitrary and capricious manner. However, in this case, the Plaintiffs seek to have this court declare that additional testing procedures are required to be engaged in by the USDA. The injunctive relief sought, therefore, implicates the USDA's delegated authority to adopt procedures and policies, while the relief sought in *Carruth* was a specific determination of liability for damages based on inspections conducted of the plaintiffs' peanuts. *See id.* (stating that plaintiffs' affidavits state that the inspectors who inspected the plaintiffs' peanuts were incapable of making a correct identification).[3] In other

**2.** It is, however, possible that *Carruth* indicates an alternate avenue of relief if the Plaintiffs wish to challenge the grading of particular peanuts in a claim for money due from the federal government.

**3.** Another distinction which can be drawn is one based less on the procedural posture of the cases and more on the evidence presented. In *Carruth*, the plaintiffs were arguing that the testing procedures utilized were arbitrary and capricious and that only chemical analysis was a sound, accurate way to determine the presence

words, the Court of Claims was conducting a much more limited inquiry, under a monetary claim, than the inquiry the Plaintiffs would have this court conduct in enjoining the uniform peanut testing procedures employed by the USDA.

Additional precedent cited to this court by the Intervenor as a basis for this court's authority to act, although the Intervenor seeks a somewhat different remedy than the Plaintiffs, is *Flagstaff Broadcasting Foundation v. F.C.C.*, 979 F.2d 1566 (D.C.Cir.1992). In *Flagstaff Broadcasting,* the court determined that the FCC was required to articulate an explanation for its failure to re-examine established policy. The plaintiffs in that case, however, first presented their challenge to the FCC, and it was the failure of the FCC to adequately respond to the plaintiff's challenge which was identified as unreasonable by the court. *See id.* at 1568. Consequently, this case does not stand for the proposition that a plaintiff may proceed before a federal court on a challenge to regulations which were proper when promulgated but which the plaintiff contends should be revised in light of developing technology.

Because the court does not find the precedent cited by the Plaintiffs or Intervenor to be persuasive authority in this case, this court is left with the general rule that its review is limited to a determination of whether final agency action by the USDA was reasonable or was arbitrary and capricious. *See Florida Manufactured Housing Assoc.,* 53 F.3d at 1572. The Plaintiffs admitted at oral argument that they do not seek to challenge the original rulemaking which was conducted when the testing regulations were promulgated. In fact, the Plaintiffs do not even contend that visual inspection should be eliminated. Instead, they argue that new advancements in science and technology require an additional step or steps in the testing process. The Plaintiffs seek to have this court enter an injunction requiring the USDA to engage in particular testing proce-

dures based on alleged technological developments.

The Plaintiffs have cited this court to numerous cases which have discussed the well-established principle that a court may review an agency's actions and may find that the actions are arbitrary and capricious if the agency relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation for its decision that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Motor Vehicle Manufacturers Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). The Plaintiffs have argued that there is scientific evidence which shows that simply relying on visual inspection of peanuts is not adequate, and that the USDA has failed to consider this evidence in persisting in conducting visual inspection. While the Plaintiffs have correctly cited numerous cases stating that the Secretary must consider important aspects of a problem and give satisfactory explanations, what the Plaintiffs have not demonstrated is that the Secretary has been provided an opportunity to consider relevant information. In fact, the Plaintiffs consistently maintain that they have never asked the Secretary for a rulemaking on the practices which they seek to challenge in this court.

Section 553(e) of the Administrative Procedure Act provides that "Each agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule." This is the mechanism provided by Congress by which people can request that changes be made in procedures such as those challenged here. The instant case seeks to challenge procedures without first petitioning for a change in a current regulation. This court agrees with the reasoning of another district court, in a slightly different

of aflatoxin. Therefore, the court found a disputed issue of fact because the various affidavits conflicted on the efficacy of visual testing versus chemical testing. In this case, the Plaintiffs have argued for an additional step in the testing procedures, but have sought to retain visual inspection. Therefore, as the Government contends, the dispute is not over whether visual testing is

reasonable, but whether it would be more reasonable to add an additional step to the testing procedures, which was not the question before the *Carruth* court. If the Plaintiffs wish to challenge only the specific grading of some of their peanuts, perhaps they should seek relief in the Court of Claims as did the *Carruth* plaintiffs.

context, that involvement by the court would be premature where the agency has not yet had the opportunity to pass upon the merits of initiating the rulemaking. *See Schmidt v. Reich,* 835 F.Supp. 435, 444 (N.D.Ill.1993). Court involvement seems especially premature in this case given that, if the court were to afford the Plaintiffs the relief they have requested, the court would re-institute a rule, the so-called "24–hour rule" which the agency abolished in the late 1970's and which was challenged by peanut producing groups while it was in place. The court would also have to require a procedure, chemical testing, which the unrefuted evidence establishes is not supported by a consensus in the industry. Furthermore, this court would have to address scientific evidence of the appropriate action level for chemical testing.

 Although the Defendants have not raised this issue, the fact that there is no real agency action challenged as the Plaintiffs' primary claim raises concerns about the finality of the purported action in this case. Federal courts may only review final agency action. 5 U.S.C. § 704. The United States Supreme Court has made it clear that regulations are final agency action. *Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), *overruled on other grounds by Califano v. Sanders,* 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). However, as indicated above, the primary claim in this case is not a challenge to a regulation, but is a claim that the Secretary of Agriculture has acted arbitrarily and capriciously in failing to alter testing procedures in light of new technological and scientific advancements.

 Agency action is final when it imposes an obligation, denies a right, or fixes some legal relationship. *Action on Smoking and Health v. Department of Labor,* 28 F.3d 162, 165 (D.C.Cir.1994). In deciding whether an action is final, courts are to take a pragmatic approach and look at whether the challenge presented is a legal issue, whether the agency action is definitive, whether it has a direct and immediate effect on the parties, and finally whether judicial review will serve efficiency or enforcement of the regulatory

scheme. *Federal Trade Commission v. Standard Oil Co. of California,* 449 U.S. 232, 239, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980).

An examination of the relevant factors indicates that the Plaintiff's primary claim is not a challenge to final agency action. The questions before the court are not purely legal, but would involve considerations of policy relating to action levels for chemical testing and the wisdom of having the "24–hour rule." Although the Plaintiffs have pointed out that the USDA is aware that there are problems with the testing procedures, as evidenced by an aflatoxin assay report and the fact that the USDA has indicated it will conduct a rulemaking, an action which represents a threshold determination that further inquiry is warranted does not constitute a definitive statement of the agency's position. *See id.* at 241, 101 S.Ct. 488. Although the Plaintiffs in this case may be affected by the lack of new testing procedures, the court cannot conclude that its intervention will serve efficiency or enforcement of the regulatory scheme. The Plaintiffs have asked this court to judicially require chemical testing and reinstitution of the 24–hour rule without the benefit of the agency's expertise and before the agency has an opportunity to conduct a rulemaking on chemical testing. If this court were to give the Plaintiffs the relief they have requested, the court would not be making the regulatory scheme more efficient, the court would be bypassing the agency process set up by Congress. *See Jerome Milton, Inc. v. Federal Trade Commission,* 734 F.Supp. 1416, 1423 (N.D.Ill. 1990) (no finality were agency has not had opportunity to perform administrative proceedings and apply its expertise). In addition, the Plaintiffs' requested relief not only would require the court to interfere in the regular decision making process of the agency, it would require the court to make the agency's decisions for it, which is a function that this court cannot perform. *See Motor Vehicle Manufacturers Association of the U.S. v. State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29, 42, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) ("a court is not to substitute its judgment for that of the agency.").[4]

---

4. The court notes that some courts have determined that delay in making a decision may at some point reach the level of a final agency decision; however, the evidence in this case does

The Supreme Court has analyzed a claim that is analogous to the Plaintiffs' primary claim in this case in *Auer v. Robbins*, 519 U.S. 452, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997). In *Auer*, the Court addressed a claim that the Secretary of Labor acted arbitrarily and capriciously in failing to revisit a rule in the wake of a new Supreme Court decision. *Id.* at 910. The court recognized that there were significant issues that warranted consideration by the Secretary, but held that complaints about the failure to change the rule could not be raised in the courts in the first instance. Id. The court stated that while a

> court may certainly be asked by parties in respondents' position to disregard an agency regulation that is contrary to the substantive requirements of the law, or one that appears on the public record to have been issued in violation of procedural prerequisites ... where, as here, the claim is ... that it was "arbitrary" and "capricious" not to conduct amendatory rulemaking (which might well have resulted in no change), there is no basis for the court to set aside the agency's action prior to any application for relief addressed to the agency itself. The proper procedure for the pursuit of respondents' grievance is set forth explicitly in the APA; a petition to the agency for rulemaking, § 553(e), denial of which must be justified by a statement of reasons, § 555(e), and can be appealed to the courts, §§ 702, 706.

*Id.* Similarly, in this case, the Plaintiffs have attempted to cast their claim not as one challenging the decades-old regulations, but instead as a claim that the regulations have become outmoded by changing technology, so that the Secretary has acted arbitrarily and capriciously in following those regulations, rather than amending them in light of the changed circumstances. Under *Auer*, however, the mere existence of changed circumstances does not mean that jurisdiction is proper in federal court. If the changed circumstances of an intervening court ruling do not place a question before the court for review in the first instance, the changed circumstances of new technology and science

seem to be even less appropriate as a basis for judicial review. Consequently, the court concludes that the Defendants are entitled to summary judgment on the Plaintiffs' primary claim for relief.

The Plaintiffs have made additional allegations in their Complaint which the Defendants have argued are also due for summary disposition. One claim expressly brought by the Plaintiffs in their Complaint is that in abolishing the "24-hour rule" several years ago, the USDA did not follow appropriate rule-making procedures.

■ If an agency adopts rules that reverse or depart radically from prior longstanding policy, the agency must invoke the notice-and-comment process required by the APA. *See Vencor v. Shalala*, 988 F.Supp. 1467, 1471 (N.D.Ga.1997) (citing *Jean v. Nelson*, 711 F.2d 1455 (11th Cir.1983), *vacated on other grounds*, 727 F.2d 957 (11th Cir.1984)). The APA requires that federal agencies publish proposed rules in the Federal Register in order to provide the public with notice and an opportunity to comment. 5 U.S.C. § 553(b), (c).

■ The Defendants have stated that appropriate rule-making procedures were followed when the 24-hour rule was abolished several years ago. The Defendants point to the Federal Register and state that the Department published notice of the proposed rule and received comments. *See* Defendants' Exhibit C. The Defendants have also pointed this court to the portion of the Federal Register in which the Department of Agriculture discussed the comments it received in response to the proposed change and indicated that there was considerable opposition to the proposal to prohibit producers from attempting to clean peanuts graded as segregation 3, but that most respondents were in favor of the proposal if the discount on transferred peanuts was reduced. The Defendants state that the proposed procedure was retained and the recommendation of a reduction in the discount was also adopted.

not indicate that those circumstances are present here given that there is no evidence that the USDA was ever presented with any request to

conduct a rulemaking on the challenged procedures. *See Environmental Defense Fund, Inc. v. Hardin*, 428 F.2d 1093 (D.C.Cir.1970).

The Plaintiffs state in their briefs submitted to the court that they do not concede that the 24–hour rule was withdrawn in accordance with the APA. However, the Plaintiffs have pointed to no evidence which would indicate that the USDA failed to provide adequate opportunity for comment or that the USDA did not consider comments which were made in response to the proposed rule. The Plaintiffs also essentially indicated during oral argument before the court that they had abandoned this claim. Given that the only evidence before the court indicates that the Department gave notice of the proposed abolition of the "24–hour rule" and received and considered comments, the court concludes that the Department did not violate the procedures required by the APA when the "24–hour rule" was abolished and that the Defendants are entitled to summary judgment on this claim.

The Plaintiffs have also claimed in their briefs that the Department acted arbitrarily and capriciously by refusing to reinstate the "24–hour rule"as a temporary regulation in response to a letter written to the Secretary by Randall Griggs and Carl Sanders. This was not a claim that was brought in the Plaintiffs' Complaint. The Complaint has three Counts, each of which mentions that the Plaintiffs contend that the "24–hour rule" was abolished without opportunity for notice and comment, but none of which alleges that the USDA failed to institute a rulemaking in response to a request to reinstate the "24–hour rule" or acted arbitrarily and capriciously in failing to readopt the "24–hour rule" as a temporary measure. The Plaintiffs also did not press this claim at oral argument, nor did they argue that the Complaint should be construed to include such a claim. Because the Complaint does not make a claim for relief based on failure to regulate in response to the letter of Randall Griggs and Carl Sanders, the court concludes that such a claim is not before it for review.

■ Even if this court were to construe the Complaint as stating a claim based on the Secretary's alleged failure to regulate in response to the letter from Randall Griggs and Carl Sanders, however, the court agrees with the Defendants that there is no decision to review because the letter was not a petition for a rule-making. The court recognizes that courts are sometimes willing to construe letters as petitions for rulemaking where it is clear that the request made to the Secretary is a request for a rulemaking. *See American Horse Protection Ass'n, Inc. v. Lyng,* 812 F.2d 1 (D.C.Cir.1987). In *American Horse Protection Association,* although the District of Columbia Circuit broadly interpreted a request as a petition for a rulemaking, in reaching that conclusion, the court also relied on the fact that the correspondence from the agency officials to the requesting parties demonstrated that the agency understood the requests to be petitions. *Id.* at 5.

■ The letter in the instant case states that the Plaintiffs "wish to ask for immediate action in the options available to producers when peanuts are graded Segregation 3." *See* Letter to Dan Glickman from Carl Sanders and H. Randall Griggs, page 1. There is no indication on the record that the agency ever treated this as a request for a rulemaking; in fact, the Defendants represented at oral argument that the letter was not viewed as a request for rulemaking. In addition, the response letters written by the USDA to Carl Sanders and Randall Griggs, which were submitted to the court after oral argument, refer to "this crop" and seem to indicate that the USDA considered the letter to be a request for relief only with regard to the current year's crop. Furthermore, the Plaintiffs indicated at oral argument that the letter written to the Secretary was not a request for a rulemaking. Accordingly, there is no claim for denial of a request for a rulemaking before the court.

■ In addition, even if the court considers the Plaintiffs' claim that the Secretary acted arbitrarily and capriciously in not reinstating the 24–hour rule as a temporary regulation, the court would conclude that the Secretary's actions withstand arbitrary and capricious review. Judicial arbitrary and capricious review is highly deferential to the agency decisionmakers so that, to prove that the agency's decision was arbitrary and capricious, the moving party must show, not merely that the record contains evidence in support of their position, but that the record is devoid of reasonable evidence that would support the agency's decision. *See Orga-*

*nized Fishermen of Florida, Inc. v. Franklin,* 846 F.Supp. 1569, 1573 (S.D.Fla.1994).

While arbitrary and capricious review of agency action is quite deferential, there is an even higher burden when a plaintiff challenges the Secretary's failure to regulate. *See WWHT, Inc. v. Federal Communications Commission,* 656 F.2d 807 (C.A.D.C. 1981) (stating that consideration of claims would be to ignore the institutional disruption that would be caused by our second guessing the expert determination not to pursue a particular program or policy at a given time and would require the court to ignore that the policy determinations raise issues that are not well suited for determination by the court). A refusal to regulate by the Secretary is to be overturned only in the rarest and most compelling of circumstances. *American Horse Protection Ass'n. Inc.,* 812 F.2d at 4.

The evidence in this case indicates that the requisite compelling and rare circumstances are not present here. The Defendants have provided this court with a Declaration of Charles Hatcher, who is the Director of the Tobacco and Peanuts Division of the Farm Service Agency of the United States Department of Agriculture. In his Declaration, Hatcher states that he knows from his personal experience the basis of the Department's actions. According to Hatcher, the USDA has considered certain changes in testing procedures but believes that no change is warranted absent a consensus in the industry. Hatcher Declaration, page 18. Hatcher states that three main options have been identified but that each is problematic. *Id.* at 18–19. Hatcher also explained that the request of the Alabama Peanut Producers Association does not purport to be based on any new scientific or other information. *Id.* at 23. In addition, the court has been provided with a copy of a letter sent to Carl Sanders and a letter sent to Randall Griggs in response to the letter of Randall Griggs and Carl Sanders in which the USDA states that although chemical testing could alleviate the problems for which the peanut producers sought the right to re-clean, the agency has not reached agreement on the use of chemical testing and that a change could diminish buyers' confidence in this crop. Accordingly, if there were failure to regulate claims before

the court, under the strict standard of review required when there is a challenge to a failure to regulate, summary judgment would still be due to be granted because the Plaintiffs have not demonstrated that the refusal to reinstate the "24–hour rule" presents compelling circumstances in this case.

Another claim for which the USDA claims summary judgment is due is based on the Plaintiffs' allegations that the USDA acts arbitrarily and capriciously because the visual inspections of peanuts which are conducted at the buying points are conducted by FSIS inspectors who are not adequately trained and who have inadequate equipment. The Defendants argue that the Plaintiffs have failed to establish standing to make such a claim because they have not identified a single FSIS employee who is incapable of detecting *A. flavus* mold, nor have they stated that any such employee incorrectly classified any of their own peanuts. The Defendants also argue that the plaintiffs have failed to pursue their appeal rights of any challenged peanut classifications and so their claims should be dismissed for failure to exhaust their administrative remedies.

The Plaintiffs' Complaint appears to allege that the qualifications of the FSIS inspectors is one reason that the current inspection method is arbitrary and capricious. The Plaintiffs do not appear to be bringing a separate claim based on specific grading of peanuts made by allegedly unqualified FSIS inspectors, since there is no request for relief that relates to the qualifications of these inspectors, nor is the court aware of any authority by which it could review such a claim in the first instance where there has been no administrative action nor request for administrative action on this issue. Therefore, the court considers the arguments with regard to the FSIS inspectors to be support for the Plaintiffs' primary claim, which was discussed above, that the inspection procedures as implemented are arbitrary and capricious, rather than as an attempt to state a separate claim for relief.

The Plaintiffs also contend that the Defendants have acted arbitrarily and capriciously because they treat peanut farmers differently from the way in which peanut shellers are

treated. The Plaintiffs state that under a Marketing Agreement, peanut shelling companies are given alternatives for dealing with peanuts which are scientifically known to contain aflatoxin, but these alternatives are not available to a farmer who only has suspect Segregation 3 peanuts. The Plaintiffs also argue that a Segregation 3 designation can be made based on one peanut out of a load, whether the load be 500 or 20,000 pounds, while a sheller does not have to test for aflatoxin unless the mold is present on 1% of the peanuts. The Plaintiffs also state that the Marketing Agreement allows shellers to clean and test Segregation 3 peanuts for seed and place the residual peanuts in the edible trade, but the farmer is not given that right.

The Defendants respond that the Plaintiffs' suggestion fundamentally confuses the purposes of inspecting farmers stock peanuts at the buying point and the testing of processed peanuts at a later stage. According to the Defendants, farmers' stock peanuts are graded by FSIS to establish the proper support price, while shellers' peanuts are tested under FDA dictates to determine how much aflatoxin is present. As the Defendants explain it, the USDA is not responsible for ensuring that peanuts are non-toxic, while the FDA is.

The court first notes that the Plaintiffs have not brought in their Complaint, and confirmed at oral argument that they did not intend to bring, a constitutional claim based on alleged unequal treatment. In addition, although the Plaintiffs point to a 1996 Marketing Agreement as a basis for some of the inequity which they perceive in the treatment of peanut producers as compared to shellers, the Plaintiffs have not brought a challenge in this court to the 1996 Marketing Agreement itself.

Because there is no constitutional claim before the court, the Plaintiffs' contentions that the Secretary is biased toward the shellers does not afford the Plaintiffs a separate ground for relief in this court, but rather is support for the Plaintiffs' previously-discussed claim that the current testing procedures are arbitrary and capricious.

Although the Plaintiffs have not explained the basis for this claim, this court is aware of at least one Federal Court of Claims decision in which the court looked at the treatment of two groups to determine if the agency was acting arbitrarily and capriciously. *See Hilo Coast Processing Company v. U.S.*, 7 Cl.Ct. 175 (1985). In that case, there was a challenge to the Department's refusal to amend a regulation that concededly was rational when first promulgated. *Id.* at 176. The plaintiffs in that case argued that the Secretary was inconsistent in his administration of a payment program. *Id.* at 190. The court's analysis hinged on a finding that similarly situated persons were treated differently. *Id.* at 191.

In this case, the court concludes that the evidence before it indicates that shellers and peanut producers are not similarly situated. The evidence before the court establishes that cleaning procedure rules apply to the two groups at different points in the peanut selling process and that the standards for the two groups stem from the concerns of two different agencies. The Plaintiffs themselves state that the Marketing Agreement is separate from the question of price supports by stating that the Marketing Agreement "has no relevance to the Price Support Program involving the farmer." Plaintiffs' Response to Defendants' Motion, page 5. Therefore, to the extent that such a claim can be brought in this court, the court concludes that the Plaintiffs have failed to demonstrate that they have been treated differently from similarly situated persons.

In summary, the court finds that the Plaintiffs have not demonstrated to this court that there is a claim for relief which may properly be heard by this court based on the nature of the peanut testing procedures of the USDA, nor have they demonstrated that there are any other claims which they have asserted for which questions of fact preclude summary judgment in favor of the Defendants. The Plaintiffs have available to them appeal procedures for particular gradings of peanuts, they may have an avenue for relief under the *Carruth* case before the Federal Court of Claims based on particular peanut gradings, and the Plaintiffs can petition the USDA for a rulemaking. The court realizes that the Plaintiffs feel they will suffer irreparable

harm if they are not given the opportunity to clean their peanuts or to have them retested; however, it is not the proper role of this court to bypass the administrative procedures put in place by Congress which allow for the agency with expertise in this area to decide peanut grading policy. The court understands and takes seriously its duty to review agency actions to be sure the agency is complying with its mandate from Congress, but until the agency has been presented with an opportunity to act, there is no decision, nor failure to act, which is properly before this court for review.

## B. The Intervenor's Claims

The Intervenor agrees with the Plaintiffs' contentions in large part, but states that if the Plaintiffs were to prevail, their requested relief will not make the peanut testing process less arbitrary, because the Plaintiffs will be satisfied with classifications of their peanuts as Segregation 1 and will not demand chemical retesting. In other words, as the Intervenor clarified at oral argument, although it did not initiate this action, if this court is going to grant relief to the Plaintiffs, the Intervenor wants its position to be made known because the relief sought by the Plaintiffs will actually injure the Intervenor. The Intervenor wants this court to allow the Intervenor to negotiate purchases of peanuts without regard to their classification as Segregation 1, Segregation 2, or Segregation 3.

The Defendants argue that the Intervenor's demand implicates certain aspects of the peanut program which have been established by Congress. Congress has prescribed that only quota peanuts may be used for domestic edible uses. The Secretary has determined that to be eligible for a support price loan at the quota price, peanuts must be graded as Segregation 1 peanuts. Therefore, Segregation 2 and Segregation 3 peanuts are not quota peanuts, but are classified as additional peanuts. The Defendants argue that the Intervenor would benefit from the change it seeks because it could purchase Segregation 2 and 3 peanuts for the additional rate, rather than the full support price, as edible peanuts and drive down the price of quota peanuts. The Intervenor sharply contests the USDA's evaluation of its position and claims that these are disputed facts.

■ At oral argument, the court asked the Intervenor why its claims would not be time barred. The court is concerned that since the regulations at issue were promulgated decades ago there are timeliness problems, either under the doctrine of laches or the statute of limitations.[5] In response, the Intervenor argued that it is not challenging the regulations as promulgated, but is arguing that the regulations have become arbitrary and capricious in light of changing technological standards. The Intervenor agreed at oral argument that the USDA is the most appropriate forum for determining what the new testing procedure should be, but urges this court to strike down the current regulations and then leave it to the USDA to come up with a new regulation at a later date.

Under the Intervenor's theory, this court can strike down a regulation as being arbitrary and capricious based on the court's independent finding that technological advances have made the regulation unreasonable, even though it was reasonable at the time it was promulgated. Although the Intervenor has cited *Flagstaff Broadcasting* as authority for this court's review of this claim, as the court has previously discussed, the plaintiff in *Flagstaff Broadcasting* pursued her administrative remedies and then sought review of a final agency action. In this case, the Intervenor has not argued that it has sought relief from the USDA. The Intervenor does not claim that a request for a rulemaking has been denied. Instead, the Intervenor asks that current regulations be invalidated based on purported new scientific and technological advancements without first presenting these arguments to the USDA.

As the court previously discussed, the court can only review final agency action. 5 U.S.C. § 704. If, as the Intervenor stated at oral argument, the Intervenor seeks not to challenge regulations as promulgated, but in-

---

**5.** A six year statute of limitations applies to a challenge under the APA, unless the challenge is that the Secretary exceeded constitutional or statutory authority. *Sierra Club v. Slater*, 120 F.3d 623 (6th Cir.1997). The doctrine of laches could also be applicable. *See eg., State of Alabama v. Bowen*, 659 F.Supp. 297, 302 (D.D.C. 1986).

stead seeks to have regulations stricken down based on alleged technological and scientific advancements, the Intervenor is asking this court to determine whether chemical testing is better than visual testing and to decide what action level is appropriate for chemical testing, when the only evidence before the court indicates that there is no consensus even in the peanut industry on these issues. The Intervenor further asks that it be able to independently negotiate the price paid for peanuts. Regardless of the factual dispute which may exist as to the effect of such a policy, there is no evidence before the court that the agency has been given an opportunity to evaluate the wisdom of this policy.

As was earlier discussed, the court cannot conclude that such an action is properly before it for review. Under application of the factors relevant to a pragmatic determination of whether there is final agency action, the challenge to the regulation is not purely legal but requires considerations of policy. The USDA has not made a definitive statement on any of the Intervenor's contentions, and while not changing the regulations may have an effect on the parties, judicial review will not serve efficiency or enforcement of the regulatory scheme. *See Federal Trade Commission v. Standard Oil Co. of California,* 449 U.S. 232, 239, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980). Instead, the Intervenor would have the court make policy determinations which are best made by the agency charged with making those determinations and would have the court substitute its own judgment for that of the USDA.

The court emphasizes that the Intervenor has the option of requesting a rulemaking of the USDA. Furthermore, the USDA has represented to the court that it will start a rulemaking on the question of chemical testing in the Fall, which will also provide the Intervenor an opportunity to participate. Should the Intervenor pursue this avenue for relief and the USDA should prove itself to be recalcitrant, or should fail to give the Intervenor its requested relief, or should fail to give an adequate explanation of its actions, the Intervenor will have the option of seeking judicial review of this final agency action. To be clear, this court has not determined that the USDA's current procedures are rea-

sonable under existing circumstances. Whether or not the USDA is acting reasonably is a determination which can be made by a reviewing court once the Secretary has either taken action, or refuses to take action, within the context of the administrative framework contemplated by Congress.

## V. CONCLUSION

For the reasons discussed, the court concludes that the Defendants' Motions for Summary Judgment are due to be GRANTED. A separate Order will be entered in accordance with this Memorandum Opinion.

## ORDER

In accordance with the Memorandum Opinion entered on this date, it is hereby ORDERED that the Motions for Summary Judgment filed by the Defendants are GRANTED. Judgment is entered in favor of the Defendants Dan Glickman, as Secretary of the United States Department of Agriculture; Keith Kelley, as Executive Vice–President of the Commodity Credit Corporation; Keith Kelley, as Administrator of the Farm Service Agency; the United States Department of Agriculture; the Commodity Credit Corporation; and the Farm Service Agency, and against the Plaintiffs, Ray T. Boyd, Charles Michael Hines, James E. Kelly d/b/a Kelly Farms, and Sessions Company, Inc. and the Intervenor, the American Peanut Shellers Association.

Costs are taxed against the Plaintiffs and Intervenor.